**COORS BREWING COMPANY,**
**Plaintiff,**

v.

**ANHEUSER-BUSCH COMPANIES, INC.**
**and D'Arcy Masius Benton &**
**Bowles, Defendants.**

**No. 92 Civ. 5959 (MBM).**

United States District Court,
S.D. New York.

Aug. 19, 1992.

---

Daniel J. Kornstein, Robert D. Helfand, Kornstein Veisz & Wexler, New York City, Bradley, Campbell, Carney & Madsen, Golden, Colo., for plaintiff.

Richard Lehv, Laurence S. Rickles, Weiss Dawid Fross Zelnick & Lehrman, P.C., New York City, Kenneth A. Plevan, Miriam L. Siroky, Constance S. Huttner, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants.

OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff, Coors Brewing Company, sues Anheuser–Busch Companies, Inc. and

D'Arcy Masius Benton & Bowles, Anheuser–Busch's advertising agency, claiming that Anheuser–Busch's recent promotional campaign violates § 43(a) of the Lanham Act, New York unfair competition law, and §§ 349 and 350 of New York General Business Law. Plaintiff has sought a preliminary injunction prohibiting defendants' continued use of the advertisements at issue. For the reasons set forth below, plaintiff's application for a preliminary injunction is denied.

## I.

Since 1978, Coors has been expanding from the western United States into a nationwide market. Also since 1978, Coors has marketed a reduced-calorie beer called Coors Light. Coors manufactures its line of beers, including Coors Light, using a process that the beer industry calls "high gravity brewing." During the 30 to 60 days it takes to produce the "high gravity" brew, it is cooled to about 4 to 5 degrees centigrade. When the aging process is completed, the brew is filtered to remove yeast and other microbes. The temperature of the brew then is reduced further, to approximately minus 1 degree centigrade. Finally, the high gravity brew, whose alcohol content exceeds the statutory maximum for beer, is "blended" with water.

Most Coors Light is processed fully, *i.e.*, brewed, blended, and bottled, in Golden, Colorado. However, somewhere between 65% (plaintiff's figure) and 85% (defendants' figure) of the Coors Light supplied to the Northeast is "blended" and bottled in Virginia. Using "special insulated rail-cars" (Pl.Mem. at 9), plaintiff transports the high gravity brew from Colorado to Virginia, where plaintiff adds Virginia water to the brew, further filters the mixture, and then bottles it.

Defendant Anheuser–Busch produces a reduced-calorie beer called Natural Light. Like Coors Light, Natural Light is produced by a process of "high gravity" brewing. Apparently, the only material difference between the processes used to produce Coors Light and Natural Light is that Natural Light is pasteurized, a process that involves heating, whereas Coors Light is brewed at low temperatures.[1] In addition, Natural Light apparently is processed entirely—*i.e.*, brewed, blended, and bottled—in regional Anheuser–Busch breweries.

Defendants recently began an advertising campaign comparing Natural Light with Coors Light. That campaign includes radio, television, and point-of-sale advertisements, which, not surprisingly, promote Natural Light at the expense of Coors Light.

Defendants' 30–second television commercial consists of a series of images accompanied by the following narrative:

This is a railroad tanker. [flash the image of a railway tanker] This is the taste of the Rockies. [flash the image of a can of Coors Light] Tanker. [image of a railway tanker] Rockies. [image of a can of Coors Light]

Actually, a concentrated form of Coors Light leaves Colorado in a tanker and travels to Virginia, where local water dilutes the Rockies concentrate before it's sent to you.

So what's it gonna be, the Rockies concentrate or an ice cold Natural Light that leaves our local breweries fresh and ready to drink? Like this [picture of a Natural Light delivery truck], not like this [picture of railway tanker].

So drink fresh, cold Natural Light and don't be railroaded.

The phrase "don't be railroaded" is accompanied by the image of a can of Coors Light atop a railroad car, over which is superimposed a circle with a diagonal line through its center—the international safety warning symbol.

Similarly, defendants' radio advertisements portray a dialogue between two (male) beer-drinkers. One beer-drinker

---

1. The parties have disputed vigorously whether the taste of beer, unlike the taste of milk, is adversely affected by pasteurization. Coors says it is; Anheuser–Busch say it isn't. They have also disputed, in this forum and elsewhere, other features of their products and their advertising, defendants having gone so far as to accuse Coors of "*ad hominem* attacks on Natural Light." (Def. Mem. at 13) However, *de gustibus cerevesiae non scit lex*.

asks the other, "Did you know that Coors Light ships beer concentrate in railroad tanker cars?" The first beer-drinker then continues: "Yeah, all the way from Colorado—1,500 miles to Virginia. That's where they add local water."

In addition, defendants have been distributing printed materials to be displayed by retailers. These point-of-sale materials assert that Coors Light is made from concentrate while Natural Light is fresh. These materials also contain the logo "Don't be railroaded" above the image a Coors Light inside the international safety warning symbol.

Plaintiff argues that the Natural Light advertisements imply that "differences in production make Natural Light 'fresh' in a way in which Coors Light is not." (Compl. ¶ 3) In other words, those advertisements imply that Natural Light is "fresher" than Coors Light because Natural Light leaves the factory ready to drink while Coors Light leaves Colorado in a "concentrate" form, which is diluted when it reaches Coors' plant in Virginia.

Plaintiff also contends that by broadcasting nationally the Natural Light advertisements, defendants lead consumers outside the Northeast to believe erroneously that *their* Coors Light is shipped to Virginia to be diluted before being shipped to their regional retailers.

## II. *Lanham Act Claims*

A party seeking a preliminary injunction must prove (1) the threat of irreparable harm, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *Covino v. Patrissi*, 967 F.2d 73, 76 (2d Cir.1992); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

### A. *Irreparable Injury*

█ Where a comparative advertisement is found to be false or misleading, irrepara-

ble harm will be presumed. *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir.1988). The Second Circuit has explained that, "A misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer." *Id.; see also Coca–Cola Company v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir.1982) ("[S]ales of the plaintiffs' products would probably be harmed if the competing products' advertising tended to mislead consumers in the manner alleged.").

In the case at hand, Coors and Anheuser–Busch are direct competitors in the reduced-calorie beer market. Therefore, if plaintiff can establish that the challenged advertisements either are literally false or are misleading—that is, if plaintiff can establish a likelihood of success on the merits, then irreparable injury will be presumed.

### B. *Likelihood of Success*

Section 43(a) of the Lanham Act provides in relevant part:

> Any person who, on or in connection with any goods or services, ... uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> \* \* \* \* \* \*
>
> (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

█ The Second Circuit has held that in order to obtain injunctive relief against a false or misleading advertising claim [2] pursuant to section 43(a) of the Lanham Act, a

---

**2.** Under § 43(a), a merchant's false or misleading claim may relate either to its own product or another's product. *See McNeil–P.C.C., Inc. v.* *Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1548 n. 1 (2d Cir.1991).

plaintiff must demonstrate either: (1) that an advertisement is literally false; or (2) that the advertisement, though literally true, is likely to mislead and confuse customers. *See Johnson & Johnson \* Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992); *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1548–49 (2d Cir.1991); *Johnson & Johnson v. GAC International, Inc.*, 862 F.2d 975, 978–79 (2d Cir.1988); *Coca–Cola Co.*, 690 F.2d at 317.

If a plaintiff can prove that an advertising claim is literally false, "the court may enjoin the use of the claim 'without reference to the advertisement's impact on the buying public.'" *McNeil–P.C.C.*, 938 F.2d at 1549 (quoting *Coca–Cola Co.*, 690 F.2d at 317).

However, if the plaintiff alleges that the advertising claim, despite being literally true, is likely to mislead or confuse customers, "It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive." *Johnson & Johnson \* Merck*, 960 F.2d at 297. Therefore, in order to maintain a claim of implied falsehood under § 43(a), the plaintiff must prove, "by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers." *Id.* at 297.

█ In other words, the plaintiff must submit consumer surveys showing that the challenged advertising claim tends to mislead or deceive consumers. Where the plaintiff fails to "demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement, the plaintiff cannot establish that it suffered any injury as a result of the advertisement's message." *Id.* at 298. However, "The extent to which consumers are deceived need not be established to support the finding that an advertisement tends to mislead, all that is required is a 'qualitative showing [to] establish that a not insubstantial number of consumers received a false or misleading impression from it.'" *McNeil–P.P.C., Inc. v. Bristol–Myers Squibb Co.*, 755 F.Supp. 1206, 1211 (S.D.N.Y.1990) (bracket in original) (quoting *McNeilab, Inc. v. American Home Products Corp.*, 501 F.Supp. 517, 528 (S.D.N.Y.), *modified on other grounds*, 501 F.Supp. 540 (S.D.N.Y.1980)), *aff'd*, 938 F.2d 1544 (2d Cir.1991).

### 1. Literal Falsehoods

█ In the case at hand, Coors contends that the challenged advertisements contain two literal falsehoods: (1) that "Coors Light is made from 'concentrate' that is 'diluted' with water" (Pl.Mem. at 12; *see also id.* at 13, 18–19); and (2) that "Coors Light travels to Virginia 'before it's sent to you.'" (*Id.* at 13; *see also id.* at 20)

As to defendants' advertising claim that Coors Light is made from a concentrate, Coors has failed to prove literal falsehood. The challenged commercial states that Coors Light travels from Colorado to Virginia in "a concentrated form" and asks, "So what's it gonna be, the Rockies concentrate or an ice cold Natural Light ...?" Relying on 27 C.F.R. § 25.11, which provides that a "[c]oncentrate is produced from beer by the removal of water," plaintiff would define "concentrate" only as a substance from which water has been removed. (Pl. Mem. at 19) However, defendants proffer another, equally plausible definition of "concentrate," namely, "a concentrated substance" or "concentrated form of something." (Def.Mem. at 8) In addition, when "concentrate" is used as an adjective, it means "concentrated." In turn, "concentrated" means "(1) rich in respect to a particular or essential element: strong, undiluted; (2) intense...." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 469 (1986). Because the term "concentrate" is equally open to either party's definition, defendants' advertising claim that Coors Light is made from a concentrate is ambiguous at most. Therefore, the commercial's reference to concentrate is not literally false.

In addition, plaintiff argues that the commercial's claim that Coors Light is diluted is literally false. However, dilute means, *inter alia*, "to make thinner or more liquid

by admixture (as with water); to make less concentrated: diminish the strength, activity, or flavor of...." *Id.* 633. It is undisputed that water is added to the "high gravity" brew—or concentrate—to produce the final product. That process makes the concentrate less concentrated. Therefore, neither is defendants' use of the term dilute literally false.

Plaintiff also challenges as literally false, except as applied to the Northeast, defendants' claim that Coors Light travels to Virginia before it is distributed to consumers. However, Anheuser–Busch "represents that the commercials will not be broadcast on any 'superstations' or other media that can be received outside of the Northeast." (Def.Mem. at 22) Therefore, this portion of plaintiff's application for injunctive relief is moot.

### 2. *Implied Falsehoods*

■ Plaintiff contends that by repeatedly stating that Coors Light is made from concentrate and is diluted, and by showing Coors Light being shipped from Colorado in railway cars while stating that Natural Light leaves Anheuser–Busch factories fresh and ready to drink, defendants' commercial implies three falsehoods: (1) that Natural Light is not also made by a process of "high gravity" brewing; (2) that all of the Coors Light sold in the Northeast has been "blended" with Virginia water; and (3) that there is a difference between Colorado Coors and Virginia Coors. (*See* 8/14/92 Tr. at 11–14)

As discussed above, *see supra* pp. 968–969, a claim for implied falsehood rises or falls on a plaintiff's evidence of consumer confusion, *i.e.*, market surveys. In the case at hand, plaintiff retained a market research and behavioral consulting firm called Leo J. Shapiro and Associates ("Shapiro") to conduct market surveys. (Johnson Aff. ¶ 1) Philip Johnson, Shapiro's president, has submitted an affidavit setting forth the results of those surveys (*Id.*); he also testified—sort of—at the preliminary injunction hearing. (*See* 8/14/92 Tr. at 31–48)

Between August 7 and 10, 1992, Shapiro conducted consumer surveys in shopping malls located in Boston, Philadelphia, Washington, D.C., New York, Los Angeles, and Kansas City. (Johnson ¶¶ 4, 5) In all, Shapiro interviewed 200 men and 100 women who were over 21 years old and who had consumed beer in the preceding four weeks (*Id.* ¶¶ 4, 6); 50 people were interviewed at each location. (*Id.* ¶ 5)

Survey respondents were shown the challenged Natural Light television advertisement. (*Id.* ¶ 7) After respondents had been shown the advertisement once, they were asked the following two questions:

*Question 2a:*

Now, tell me what you recall about the commercial I just showed you?

Probe: What else was it about?

*Question 2b:*

And, what was the central theme or message in this commercial? What were they trying to tell you?

(*Id.* ¶ 7 and Ex. A)

The following is a list of the relevant answers elicited by Question 2a, as well as the corresponding percentages[3] of respondents giving those answers:

| | | |
|---|---|---|
| (1) | Coors is diluted/watered down | 32% |
| (2) | Coors travels by tanker/railroad, not by truck | 26% |
| (3) | Coors/Coors Light is made from concentrate | 20% |
| (4) | Coors has to travel far/across the country | 20% |
| (5) | Coors not fresh/not as fresh | 2% |
| (6) | Coors is not pure/natural | 1% |
| (7) | Natural Light comes from local breweries/made close to home | 12% |
| (8) | Natural Light is fresher | 11% |

---

**3.** Plaintiff asserts that, "Figures add to more than 100% because some respondents gave more than one answer." (Johnson Aff. ¶ 13 *).

*(Id. ¶ 13)*

In answer to Question 2a's Probe—what else respondent recalled about the commercial—4% of all respondents said that "Natural Light is purer/more natural" and another 4% said that "Natural Light is not diluted/watered down." *(Id.)*

Respondents gave the following relevant answers to Question 2b—what was the central theme or message of the commercial:

| | | |
|---|---|---|
| (1) | Coors is diluted/watered down | 14% |
| (2) | Coors/Coors Light is made from a concentrate | 5% |
| (3) | Coors not fresh/not as fresh | 4% |
| (4) | Coors not pure/natural | 3% |
| (5) | Buy Natural Light/Natural Light is better | 28% |
| (6) | Natural Light is fresher | 18% |
| (7) | Natural Light is purer/more natural | 12% |
| (8) | Natural Light not diluted/not watered down | 9% |
| (9) | Natural Light not made from concentrate | 3% |

---

*(Id. ¶ 14)*

After respondents were asked, and answered, Questions 2a and 2b, the commercial was played a second time. Respondents then were asked six more questions:

*Question 4:*

What, if anything, did this commercial tell you about Coors Light beer?

Probe: What else?

*Question 5:*

Based on this commercial, do you believe that Coors Light and Natural Light are made the same way, or are they made differently?

If different: In what way is Coors Light made differently than Natural Light?

*Question 6:*

And, based on the commercial, do you believe there is any difference between Coors Light and Natural Light in terms of the freshness of the products?

If yes: In what way is Coors Light different from Natural Light in terms of freshness?

*Question 7:*

Based on the commercial, do you believe there is any difference between Coors Light and Natural Light in terms of the purity or naturalness of the products?

If yes: In what way is Coors Light different from Natural Light in terms of purity or naturalness?

*Question 8:*

Do you feel that seeing this commercial would encourage you to drink Coors Light beer, discourage you from drinking Coors Light beer, or would it make no difference? Why do you say that?

Probe: Why else?

*Question 9:*

By the way, do you believe that this commercial is talking about the Coors Light beer that is available where you buy beer? Why do you say that?

*(Id. Aff. ¶ 8 and Ex. A)*

In answer to Question 5, whether based on the commercial respondents believed that Coors Light and Natural Light were made the same way or different ways, 67% of all respondents answered that they believed the two beers were made in different ways while 21% of all respondents answered that they believed the two beers were made the same way. Of those respondents who answered that the two beers were made in different ways,[4] (i) 29%

---

**4.** It is not clear from Johnson's affidavit whether the percentages of respondents specifying the differences between how the two beers are made refer to percentages of all 300 respondents or whether they refer to percentages of the 67% who, in answer to Question 5a, said that the two beers are made differently. However, because plaintiff bears the burden of proof and because this is plaintiff's exhibit, I have construed the ambiguity against plaintiff and assumed that the percentages of respondents

stated that they believed that "Coors is diluted/watered down/Natural Light is not," (ii) 25% stated that "Coors/Coors Light made from concentrate/Natural Light is not," and (iii) 13% stated that "Coors made in two places/Natural Light from one place." (*Id.* ¶ 16) There were at least 20 other responses specifying differences between how the two beers are made, but those responses are not relevant to the case at hand.

Based on the answers to Question 5, plaintiff argues that 67% of all respondents falsely believed, based on the commercial in question, that Natural Light and Coors Light are made differently. (*Id.*) Adding the category of respondents who said that they believed that "Coors is diluted/watered down/Natural Light is not" (29%), and the category of respondents who said that they believed that "Coors/Coors Light made from concentrate/Natural Light is not" (25%), the total percentage of the 67% of respondents who had been misled by the commercial into thinking that Natural Light is not made by a process of high gravity brewing is 54%.. This means that, based on plaintiff's survey, 36.18% of *all* respondents were misled by defendants' commercial as to the differences between how the two beers are made.

However, "The evidentiary value of a survey's results rests upon the underlying objectivity of the survey itself." *Johnson and Johnson \* Merck*, 960 F.2d at 300 (citing *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir.1984)). That objectivity is measured by such factors as whether the survey was "properly 'filtered' to screen out those who got no message from the advertisement, whether the questions are directed to the real issues, and whether the questions are leading or suggestive." *Am. Home Prod. Corp. v. Johnson & Johnson*, 654 F.Supp. 568, 590 (S.D.N.Y.1987); *see also Weight*

*Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1272 (S.D.N.Y.1990).

In the case at hand, plaintiff's reliance on the answers elicited by Question 5 is misplaced because that question is leading and thus produced unreliable results.[5] By asking whether, "[b]ased on the commercial," the respondent believes Coors Light and Natural Light are made the same way or different ways, Question 5 assumes that the commercial conveys some message comparing how the two beers are made. *Cf. Johnson & Johnson \* Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 1991 WL 206312, at \*6, 1991 U.S. Dist. LEXIS 13689, at \*10 (S.D.N.Y. October 1, 1991), *aff'd*, 960 F.2d 294 (2d Cir.1992). But, in response to the open-ended questions—Questions 2a and 2b—a statistically insignificant percentage of respondents remarked on differences between the processes by which the two beers are made. This jump in the percentage of respondents whose answers indicate a mistaken belief that Natural Light is not also made by a process of high gravity brewing from between 3% and 9% to 36.-18% further suggests the leading nature of Question 5.

Question 5 is leading also in that it asks whether an obviously comparative advertisement, which disparages one product and promotes another, suggests or does not suggest a difference in the way the two products are made. This inquiry in itself implies, because the advertisement invidiously compares one product with another, that the advertisement does suggest a difference in the way the two products are made.

Moreover, Question 5 failed to inform respondents that they also could respond that they did not know if the commercial implied that Coors Light and Natural Light are made by different processes. This

specifying differences refers to percentages of 67% of all respondents.

5. Defendant has alleged that Question 5's results also are unreliable because (i) "there are indications that at least two of Shapiro's interviewers may have made up responses" (Def. Consumer Research Mem. at 14), (ii) Shapiro failed to

blind interviewers and respondents to the purpose of the survey (*Id.* at 15), and (iii) Shapiro failed to validate the survey. (*Id.* at 16) However, because defendant has not proffered any reliable evidence supporting these charges, I have disregarded them.

omission further undermines the reliability of the answers elicited by Question 5. *See Home Box Office v. Showtime/The Movie Channel*, 665 F.Supp. 1079, 1084 (S.D.N.Y.), *aff'd in part and vacated in part*, 832 F.2d 1311 (2d Cir.1987). For the above reasons, I do not credit Question 5 with probative value.

By contrast, I find that the survey's open-ended questions, 2a and 2b, were generally reliable. As stated above, Questions 2a and 2b elicited answers going principally to plaintiff's claims of literal falsehood, which I have rejected. *See supra* pp. 970–971. In answer to Question 2a, the bulk of respondents remarked that Coors Light is made from concentrate (20%), is "diluted/watered down" (32%), is transported by railway tanker (26%), and travels a long distance before it reaches customers (20%).

Because Johnson lumped together the percentage of respondents who said that Coors Light is diluted and the percentage of respondents who said that Coors Light is watered down, the 32% figure is uninformative. While I have found that it is literally true that in one sense Coors Light is "diluted," Coors Light does not appear to be "watered down," in the sense of containing more water than beer should or than Natural Light does. However, because I have no way of knowing what percentage of respondents said that Coors Light is diluted and what percentage said that Coors Light is watered down, this category of responses has no probative value. *See* DARRELL HUFF, *How to Statisticulate*, in HOW TO LIE WITH STATISTICS 110–20 (1954).

Apart from the answer that Coors is diluted/watered down, Question 2a elicited only two other answers—neither from a statistically significant percentage of respondents—that go to plaintiff's implied falsehood claim. First, 2% of all respondents stated that Coors is not "fresh" or not as "fresh" as Natural Light. This response is ambiguous. Johnson never questioned any of the respondents as to what they meant by "fresh"; without such information, respondents' use of that term is ambiguous and therefore unreliable. Second, 4% of all respondents stated that Natural Light is not diluted/watered down. However, as discussed below with respect to Natural Light and above with respect to Coors Light, this response is unreliable by virtue of Shapiro's having combined the percentage of respondents who said that Natural Light is not diluted and the percentage of respondents who said that Natural Light is not watered down.

Moreover, neither of the above responses is statistically significant because an answer to an open-ended question is not statistically significant unless at least 10% of all respondents give that answer. *See* K. Plevin & M. Siroky, *Advertising Compliance Handbook* at 588–89 (1991) (citing *Gillette Co. v. Wilkinson Sword, Inc.*, 89 Civ. 3586, slip op. at 17–18 (S.D.N.Y. Jan. 9, 1991)).

In answer to Question 2b, the greatest percentage—28%—of all respondents said that Natural Light is better. The second highest percentage—18%—of respondents answered that Natural Light is "fresher." However, as with the answers to Question 2a regarding "freshness," the answers to Question 2b regarding freshness are ambiguous because respondents were never probed about what they meant by "fresh." Therefore, I cannot assign probative weight to the answers to Question 2b about Natural Light's freshness.

Similarly, I cannot find probative weight in the answers stating that Natural Light is not diluted/watered down, which were elicited by Question 2b. Although a combined total of 9% of all respondents—just below the cut-off for statistical significance with respect to open-ended questions—gave these answers, that figure's reliability is vitiated by Shapiro's combination of the percentage of respondents saying that Natural Light is not diluted with the percentage saying that Natural Light is not watered down. Although the answers stating that the commercial implied that Natural Light is not diluted evince consumer confusion, those answers stating that Natural Light is not watered down do not necessarily evince consumer confusion because there

has been no claim that Natural Light is watered down.

The commercial may tend to mislead consumers only insofar as it may lead them to believe that Coors Light is watered down while Natural Light is not. However, not only did Shapiro conflate the percentage of respondents saying that Natural Light is not diluted with the percentage saying that Natural Light is not watered down, but, as discussed above, Shapiro also conflated the percentage of respondents saying that Coors Light is diluted with the percentage saying that Coors Light is watered down. Therefore, there is no way to compare the percentage of respondents saying that Coors Light is watered down with the percentage saying that Natural Light is not watered down. Moreover, there is no way to discern whether the same respondents who said that Coors Light is watered down also said that Natural Light is not watered down—the only category with respect to the "watered down" description that is meaningful to the case at hand. Accordingly, I find that the 9% of respondents saying that Natural Light is not diluted/watered down is not reliable evidence of consumer confusion as to the differences in the way Coors Light and Natural Light are made.

The one response elicited by Question 2b that is reliable and relevant to the case at hand is that "Natural Light not made from concentrate" (3%). However, as discussed above, this answer is statistically insignificant because it falls far short of the 10% cut-off for statistical significance with respect to open-ended questions. Therefore, because only 3% of all respondents remarked that Natural Light is not made from concentrate, this answer did not occur with statistically significant frequency.

Plaintiff has invited me to enjoin the advertisement at issue despite any blemishes in Shapiro's survey technique based on the "general thrust of [the] survey rather than its quantitative results." (Pl. Supplementary Mem. at 3) Here, the "thrust" is to be found in the "quantitative results," or it is not to be found at all. I decline to imagine "thrust" in the absence of evidence. *See McNeil–P.P.C.*, 755 F.Supp. at 1206. Nor is there significance in defendants' failure to conduct a survey of their own. The burden is plaintiff's, and defendants may rely on that if they choose. Accordingly, because I have found that the results of Question 5 are unreliable and that those results of Questions 2a and 2b that support plaintiff's claims are either ambiguous or are statistically insignificant, I find that plaintiff has failed to prove that the challenged commercial is likely to mislead consumers into believing that, unlike Coors Light, Natural Light is not made by a process of "high gravity" brewing.

As to plaintiff's two remaining implied falsehood claims, that (i) *all* of the Coors Light sold in the Northeast has been "blended" with Virginia water, and (ii) there is a difference between Colorado Coors and Virginia Coors, plaintiff has failed to support either of these claims with any extrinsic evidence; none of the survey questions even arguably addresses these claims. Moreover, I find that plaintiff is estopped to argue the third alleged falsehood, *i.e.*, that there is a difference between Colorado Coors and Virginia Coors. Plaintiff has promoted its beers, including Coors Light, as "the taste of the Rockies," based on use of water from the Rocky Mountains. After having advertised for years that Coors beers tasted better than other beers because Coors beers are made from Rocky Mountain water, Coors now cannot seek an equitable remedy that would prohibit defendants' hoisting Coors by its own petard.

For the above reasons, I find that plaintiff has failed to substantiate its implied falsehood claims with reliable extrinsic evidence.

### III. *Unfair Competition*

■ New York common law of unfair competition "is a tort involving the misappropriation for commercial advantage of a benefit or property right belonging to another." *Marcraft Recreation Corp. v. Francis Devlin Co.*, 506 F.Supp. 1081, 1087 (S.D.N.Y.1981) (citing *Dior v. Milton*, 9 Misc.2d 425, 155 N.Y.S.2d 443, 451 (Sup. Ct.), *aff'd*, 2 A.D.2d 878, 156 N.Y.S.2d 996

(1st Dept.1956)). Otherwise described, "The New York law of unfair competition ... bans 'any form of commercial immorality.' A cause of action for unfair competition requires unfairness and an unjustifiable attempt to profit from another's expenditure of time, labor and talent...." *Roy Export Co. Establishment Etc. v. Columbia Broadcasting System, Inc.,* 503 F.Supp. 1137, 1151–52 (S.D.N.Y.1980), *aff'd,* 672 F.2d 1095 (2d Cir.1982), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *see also American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 662 (2d Cir.1979) ("One cannot sell his product by misappropriating the good will of another through misleading the public into thinking that it is 'sponsored' by or derived from something else."), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). As the Second Circuit has explained:

> [Plaintiff's] state law unfair competition claim is also legally insufficient. This claim is based on the notion that the only finding necessary is that the defendant's action has been "unfair," as the trial judge interprets that term. New York law in this area is indeed flexible, but it is not that flexible. The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another.

*Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980) (citations omitted).

Moreover, a claim of unfair competition seems to require some showing of bad faith. In *Saratoga Vichy Spring,* the Second Circuit found that, "[c]entral to this notion [of unfair competition] is some element of bad faith." *Id.* at 1044.

In the case at hand, plaintiff has not come forward with *any* evidence showing that defendants created the challenged commercial in "bad faith" apart from what plaintiff claims is false advertising, or that defendant Anheuser–Busch has usurped unfairly plaintiff's goodwill or good reputation.

IV. *New York General Business Law*

■ Section 349 of New York's General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce." Section 350 of the General Business Law provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

The elements of a claim for deceptive practices under § 349, as well as the elements of a claim for deceptive advertising under § 350, are (i) that the act or practice was misleading in a material respect, and (ii) that the plaintiff was injured. *McDonald v. North Shore Yacht Sales, Inc.,* 134 Misc.2d 910, 513 N.Y.S.2d 590 (Sup.Ct. 1987); *see also* N.Y.Gen.Bus. Law § 349 (McKinney 1988) (Practice Commentary).

As discussed above, plaintiff's survey does not show that the challenged commercial tends to mislead consumers to any significant degree. Under §§ 349 and 350, the misleading nature of the act or practice in question is not to be determined by "look[ing] to the average customer but the vast multitude which the statutes were enacted to safeguard—including the ignorant, the unthinking, and the credulous who, in making purchases, do not stop to analyze but are governed by appearances and general impressions." *McDonald,* 513 N.Y.S.2d at 593 (quoting *Guggenheimer v. Ginzburg,* 43 N.Y.2d 268, 273, 401 N.Y.S.2d 182, 372 N.E.2d 17 (1977)). The 300 randomly intercepted consumers participating in plaintiff's survey are at least as good an indication of how "the vast multitude" will understand or misunderstand defendants' commercial as any speculation of mine. Therefore, because there is no basis for substituting my own judgment for that of the survey respondents, I find that plaintiff has failed to show that defendants' commercial is misleading in a material respect. Accordingly, plaintiff also has failed to demonstrate a likelihood of success on the merits of its New York General Business Law claims.

It goes almost without saying that the balance of hardships between these major

brewers seems evenly balanced. Certainly, plaintiff has made no showing that the balance tips decidedly in its favor.

For the above reasons, plaintiff's application for a preliminary injunction prohibiting defendants' continued use of the challenged Natural Light commercial is denied.

SO ORDERED.