**David KRAMER, Plaintiff,**

v.

**The POLLOCK–KRASNER FOUNDATION, The Pollock–Krasner Authentication Board, Inc., Sotheby's, Inc., and Christie, Manson & Woods International, Inc., Defendants.**

No. 94 Civ. 7068 (HB).

United States District Court,
S.D. New York.

June 12, 1995.

Carl E. Person, New York City, for plaintiff.

Cowan, Liebowitz & Latman, P.C., New York City (Ronald D. Spencer, Michael F. Maschio, Joseph H. Lessem, of counsel), for defendants the Pollock–Krasner Foundation,

and the Pollock–Krasner Authentication Bd., Inc.

Berger Stern & Webb, New York City (Peter R. Stern, Jonathan A. Olsoff, of counsel), for defendant Sotheby's, Inc.

Hughes Hubbard & Reed, New York City (Norman C. Kleinberg, Michael E. Salzman, Aviva L. Wernick, of counsel), for defendant Christie, Manson & Woods Intern., Inc.

## OPINION AND ORDER

BAER, District Judge:

This tempest in the art world involves defendants' alleged monopolization of the market in Jackson Pollock paintings. Defendants moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss plaintiff's antitrust and related claims. Defendants also moved for an order imposing sanctions on plaintiff's counsel under Rule 11 of the Federal Rules of Civil Procedure. For the reasons stated below, defendants' motions to dismiss are granted, and their motions for sanctions are denied.

### Factual Background

Plaintiff David Kramer, a fine art and antiques dealer in Arizona, bought a painting privately for $15,000, which he alleges could be worth $10,000,000 if it were authenticated as a Jackson Pollock and sold at auction. Compl. ¶¶ 7, 9. Kramer contacted defendants Christie, Manson & Woods International, Inc. ("Christie's") and Sotheby's, Inc. and asked them to auction his painting. Christie's informed Kramer by letter dated January 19, 1993 that it would auction the painting if Kramer obtained authentication from defendant Pollack–Krasner Authentication Board, Inc. (the "Board"). Id. ¶ 15. Kramer submitted his painting to the Board in April 1992. Two months later, the Board refused to authenticate it. Id. ¶ 16.

Late last year, Kramer sued the Board, the Pollock–Krasner Foundation ("Foundation"), Sotheby's and Christie's claiming antitrust violations pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and New York's Donnelly Act, N.Y.General Business Law § 340 (McKinney 1988) ("NYGBL"). Kramer also alleged common law unjust enrichment and interference with advantageous business relationships, as well as deceptive acts under NYGBL Section 349. Kramer alleged that the antitrust conspiracy began at Pollock's death in 1956. Id. ¶ 54. The goal of the conspiracy was to exclude certain authentic Pollock pieces from the accepted canon of his work, and thereby from the market, in an attempt to increase the value of Pollock paintings owned by the Foundation and auctioned by Christie's and Sotheby's. Id. ¶ 7. Participants in the conspiracy include not only the named defendants, but also some of the nation's preeminent museums and galleries, the Yale University Press ("Yale"), the past and present trustees of the Pollock–Krasner Foundation and Authentication Board, and other parties as yet unknown. Id. ¶ 12. Kramer alleged that to achieve the goal of this conspiracy, the defendants unreasonably restrained and dominated the "Pollock" submarket of the "modern and contemporary artists" market. Id. ¶ 10.

As factual support, Kramer claimed that: (1) the Foundation possesses a large stockpile of Pollock paintings, id. ¶¶ 3, 30; (2) the Board fails to conduct a reasonable investigation of paintings submitted for authentication or to employ the skills of competent persons to make their determinations regarding authenticity, id. ¶¶ 17, 30; (3) Christie's and Sotheby's together control 100% of the Pollock auction market, and auction only Pollock works authenticated by the Board or listed in the Jackson Pollock Catalogue Raisonné, (Yale, 1978) ("Catalogue Raisonné"), id. ¶¶ 15, 28, 29, 45(B); (4) the Catalogue Raisonné describes 1,064 "authentic" Pollock works, id. ¶ 10(JJ), and was principally based upon information provided to Yale by the Foundation and the Board, id. ¶ 16; (5) the Foundation and the Board gave Yale substantially all the information it received regarding Kramer's painting, resulting in its exclusion from the Catalogue Raisonné, id.; and (6) works other than Kramer's painting will be included in a revised edition of the Catalogue Raisonné. Id.

### Discussion

#### A. Standard for Rule 12(b)(6) Motions

■ When considering the sufficiency of a complaint under a Rule 12(b)(6) motion to

dismiss for failure to state a claim, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Easton v. Sundram*, 947 F.2d 1011, 1014–15 (2d Cir.1991), *cert. denied*, 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992).

> The issue [on a motion to dismiss] is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.

*Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991).

### B. *The Antitrust Claims*

Defendants argue that the court should dismiss Kramer's Sherman claims because: (1) Kramer's market definition is incorrect as a matter of law; (2) Kramer's conspiracy allegations are conclusory; (3) Kramer fails to state a claim of monopolization or attempted monopolization; and (4) Kramer's "essential facilities" claim under Section 2 of the Sherman Act fails to plead the elements of that doctrine. I will address these arguments in turn. Because the New York Court of Appeals has held that the Donnelly Act was modelled on the Sherman Act and should be construed in light of federal precedent, *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518, 611 N.Y.S.2d 786, 634 N.E.2d 158 (1994), I will analyze the Sherman and Donnelly Act claims together.

### 1. *Market Definition*

■ In order to survive a motion to dismiss, a claim under Sections 1 and 2 of the Sherman Act must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized. *United States v. Grinnell Corp.*, 384 U.S.

563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *North Jersey Secretarial Sch., Inc. v. McKiernan*, 713 F.Supp. 577, 583 (S.D.N.Y.1989). "In determining the relevant market, the general rule is that 'commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce monopolization of which may be illegal.'" *Vitale v. Marlborough Gallery*, 32 U.S.P.Q.2d 1283, 1285, 1994 WL 654494 (S.D.N.Y.1994) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956)). A submarket may also be the subject of a monopoly if its confines are well-defined through the rule of interchangeability. *Id.* The "relevant market" has been defined as "the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market." Lawrence A. Sullivan, *Handbook of the Law of Antitrust* 41 (1977). Therefore, Kramer must "'allege how the net effect of the alleged violation is to restrain trade in the relevant market, and that *no reasonable alternative source is available* to consumers in that market.'" *North Jersey Secretarial Sch.*, 713 F.Supp. at 583 (emphasis added) (quoting *International Television Prods. Ltd. v. Twentieth Century Fox Television*, 622 F.Supp. 1532 (S.D.N.Y.1985)).

■ Kramer contends that the relevant product market is "the offering and sale *at auction* of paintings by modern and contemporary artists," with a submarket for Pollock paintings. Compl. ¶ 10 (emphasis added). Conversely, defendants argue that the limitation upon the relevant market to "paintings sold at auction" is erroneous because Kramer may sell, and did in fact buy, his alleged Pollock painting through a private sale. Kramer admits that he could sell his painting privately. *Id.* ¶ 27.

In 1993, Kramer's counsel brought a similar case for a different plaintiff alleging a similar conspiracy against the Board, the Foundation, and a major gallery, but not against Sotheby's or Christie's. In granting summary judgment to the defendants, Judge Leisure noted the non-interchangeability of

modern art, and opined that "Pollock paintings may constitute a submarket, the monopolization of which may be unlawful under 15 U.S.C. § 1 or § 2." *Vitale,* 32 U.S.P.Q.2d at 1286, 1994 WL 654494. However, the *Vitale* opinion does not suggest that the Pollocks sold *at auction* constitute a valid submarket.

Put another way, the problem in Kramer's product market theory is that he has not, and cannot, allege that his painting and others like it are saleable only at the two defendant auction houses in Manhattan. Potential purchasers of Pollocks have reasonable and varied alternatives to Sotheby's and Christie's. Kramer alleges that the "tedious means" of a private sale would fetch a lower price than the "fanfare and thrills" of a public auction. Compl. ¶ PP. Perhaps a public auction would yield a higher price because Sotheby's and Christie's advertize their sales and produce glossy catalogues. However, as is frequently the case, this coin has another side. As a dealer in fine art, Kramer could avoid the auctioneer's commission by selling the painting himself. In any event, none of these differences between auctions and private sales justifies Kramer's market definition. Kramer clearly has a "reasonable alternative" to selling his painting at auction.

As to geography, Kramer alleges that the relevant market is "New York, New York." Compl. ¶ 11. Defendants counter that the market cannot be limited to the Borough of Manhattan because, among other things, Kramer bought his painting in Arizona and nothing requires him to sell it in New York. While some New Yorkers think of their city as *the* Mecca of art and culture, Kramer does not allege that modern art generally, and Pollocks in particular, cannot be sold elsewhere. Kramer seeks to amend his complaint to add the entire United States as an alternative geographic market. Although I would gladly permit such an amendment, it will not breathe life into Kramer's market definition allegations. The flaw is not simply geographical, but results from Kramer's exclusion of dealers, galleries and private sales. Therefore, Kramer's attempt to categorize the relevant market as "Pollocks sold at auction" fails, and therewith his claims under the Donnelly Act and Sections 1 and 2 of the Sherman Act. Although under *United States v. Grinnell,* Kramer's inadequate market definition alone requires dismissal, I will briefly address the other grounds advanced by the defendants.

### 2. *The Conspiracy Claims*

■ To establish a claim of conspiracy to monopolize in violation of Section 2 of the Sherman Act, a plaintiff must allege facts sufficient to support (1) concerted action; (2) overt acts in furtherance of the conspiracy; and (3) specific intent to monopolize. *Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council,* 857 F.2d 55, 74 (2d Cir.1988). Defendants argue the complaint fails to identify the nature and rationale of the alleged conspiracy or to explain how, when, where or why the alleged conspiracy operated. In response, Kramer argues that he has made "a pretty clear statement of what is happening, sufficient to put defendants on notice as to Kramer's claim." Pl.'s Mem. Opp'n at 9.

■ The auction houses concede, and human nature supports, the proposition that a plaintiff will rarely know the inner workings of a conspiracy. Therefore, plaintiffs may prove an illicit agreement by inferences drawn from the public conduct of the alleged conspirators. *See Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). However, when a plaintiff seeks to prove a conspiracy from inferences drawn from market facts, those facts must tend to show that the allegedly conspiratorial actions resulted from some sort of an agreement, and not merely from independent, parallel conduct by firms acting in their own self-interests. *Monsanto,* 465 U.S. at 768, 104 S.Ct. at 1472 ("[T]here must be direct or circumstantial evidence that reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 596–97, 106 S.Ct. 1348, 1361, 89 L.Ed.2d 538 (1986) ("[I]f petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."); *Apex Oil Co. v.*

*DiMauro*, 822 F.2d 246, 254 (2d Cir.) (holding that an inference of conspiracy is improper where parallel action is in each defendant's individual self-interest), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). "[A] bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal." *Heart Disease Research Foundation v. General Motors Corp.*, 463 F.2d 98, 100 (2d Cir.1972).

■ The complaint fails to support the existence of a conspiracy because it presents no coherent theory of participation by Sotheby's or Christie's in the alleged conspiracy. In *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 601, 121 L.Ed.2d 537 (1992), the plaintiff alleged that the cable operator defendants had conspired with defendant TNT, a cable programmer, to aid TNT in acquiring or maintaining a monopoly in the market for the TNT channel. The Tenth Circuit found this allegation "implausible," because the cable operators would have no rational motive to help TNT create a monopoly. *Id.* at 1026–27. Similarly, Sotheby's and Christie's lack a rational motive to conspire with the Pollock–Krasner defendants to establish a monopoly. Even assuming a monopoly market were established, plaintiff does not contend that the auction houses would benefit. In fact, although the auction houses might receive higher commissions per sale from the fewer Pollocks sold in a monopoly market, they would likely profit far more from an increased number of sales that would occur in an open market. Kramer has alleged no support for his contention, and I would find it most interesting to know, that owners of Pollocks can only sell them at auction, much less only through Sotheby's or Christie's.

Even accepting Kramer's factual allegations as true, it is clear that the defendants acted in their own self-interest. For example, Sotheby's and Christie's have an independent interest in not selling forgeries because of potential damage to their reputations, not to mention legal liability. *See Greenwood v. Koven*, 880 F.Supp. 186 (S.D.N.Y.1995). As for the Board, it is not the only group of experts that can provide opinions of authenticity for Pollocks. Kramer admits that he can and has obtained authentication opinions of other art experts and that the Board's refusal to authenticate does not prevent him from selling privately. Thus, while Kramer may believe the defendants conspired to keep Pollock paintings off the market, the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy. Therefore, even when viewed in a most favorable light as such a motion requires, Kramer's conspiracy claims must be dismissed for failure to allege a sufficient factual basis.

### 3. *The Monopolization Claims*

■ To state a claim of monopolization or attempted monopolization under Section 2 of the Sherman Act, Kramer must establish that the defendant either possesses monopoly power in the relevant market and willfully acquired or maintained it, *Volvo N. Am. Corp.*, 857 F.2d at 73, or that the defendant has a "dangerous probability" of achieving such power and has the specific intent to monopolize. *Spectrum Sports, Inc. v. McQuillan*, —— U.S. ——, ——, 113 S.Ct. 884, 892, 122 L.Ed.2d 247 (1993). Kramer contends that a "shared monopoly" concept is applicable here, based upon the alleged conspiracy to monopolize. However, the offense of monopolization under Section 2 refers to market dominance by a "single firm." *Spectrum Sports*, —— U.S. at ——, 113 S.Ct. at 889. While allegations of a shared monopoly, i.e., that the defendants' combined market power constitutes monopolization or attempted monopolization of the relevant market on first blush may seem persuasive, they do not constitute a violation of Section 2. *H.L. Hayden Co. v. Siemens Medical Sys. Inc.*, 879 F.2d 1005, 1018 (2d Cir.1989).

Having defined his alleged submarket as Pollock sales at auction in Manhattan, it comes as no surprise that Kramer thinks the two defendant auction houses control 100% of the market. Even after amending his market definition to include the entire United States, Kramer still alleges that "all of the Pollocks sold at auction in the U.S. or in the

world are sold in New York, New York, through the two defendant auction houses." Aff. of Carl E. Person at 3. Such "tautological" allegations do not state a claim for Section 2 monopolization. *H.L. Hayden Co.,* 879 F.2d at 1018. In this regard, Kramer's faulty market definition undermines his monopoly claim. Sotheby's and Christie's correctly point out that they are incapable of singularly dominating or monopolizing the Pollock market because it is, in fact, not limited to auctions. They also note that they merely act as agents for owners who want to sell paintings. As to the Foundation and the Board, Kramer neither alleges what market share they control nor facts demonstrating that either has the power to monopolize the Pollock auction submarket. Therefore, Kramer's monopolization claims must be dismissed.

### 4. Essential Facilities

 The "essential facilities" doctrine is not an independent cause of action, but rather a type of monopolization claim. Count 3 of the complaint, invoking the essential facilities doctrine, in addition to possessing the same shortcomings as the Count 2 monopolization claim, fails because Kramer has not pleaded the basic elements of a claim under this doctrine. Kramer must meet two prerequisites before the essential facilities doctrine comes into play. First, the defendant's facility must be "essential," or one for which there is no feasible alternative. *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990). Second, the plaintiff must be a competitor of the defendant monopolist whose facility it seeks to employ. *Id.* at 569; *see also Garshman v. Universal Resources Holding Inc.,* 824 F.2d 223, 230 (3d Cir.1987); *Soap Opera Now, Inc. v. Network Pub. Corp.,* 737 F.Supp. 1338, 1349 (S.D.N.Y.1990). Kramer's counsel conceded at oral argument that Kramer could sell his painting privately. Clearly Kramer does not compete with Sotheby's or Christie's. He does not conduct auctions and they do not own paintings. Sotheby's and Christie's Manhattan auctions can only be an "essential facility" if Kramer cannot sell his painting in any other way. Therefore,

Kramer's essential facilities claim must be dismissed.

### C. The Unjust Enrichment Claim

 Kramer claimed that the defendants have been "unjustly enriched" by their allegedly illegal, anticompetitive conduct. However, Kramer has failed to state a claim under either the Sherman Act or the Donnelly Act. Consequently, because Kramer's unjust enrichment claim "hinges on ... practices claimed by plaintiff to be illegal," and because the allegations of illegality in the complaint fail, the unjust enrichment claim must be dismissed. *Sands v. Ticketmaster–New York, Inc.,* 207 A.D.2d 687, 616 N.Y.S.2d 362, 364 (1st Dept.1994).

### D. Claim Under Section 349 of the General Business Law

 Next, Kramer alleged that the defendants have violated Section 349 of New York's General Business Law by engaging in "deceptive acts." Complaint ¶¶ 76–79. Although Section 349 is a broad statute designed to protect consumers, it does not extend to every dispute that may arise between a merchant and a consumer. Instead, as Judge Weinfeld explained in *Genesco Entertainment v. Koch,* 593 F.Supp. 743 (S.D.N.Y. 1984):

> That the deceptive practices this statute [Section 349] seeks to combat involve recurring transactions of a consumer type is further supported by the origin of the statute. Section 349(h) is substantially modelled on the Federal Trade Commission Act. Hence, in interpreting the phrase "deceptive practices," the New York courts have in large measure relied on the Federal Trade Commission Act's definition of such practices. *That Act only prohibits those deceptive practices which affect the public interest. Private transactions not of a recurring nature or without ramifications for the public at large are not a proper subject of Commission inquiry.*

*Id.* at 752 (emphasis added) (footnotes omitted); *accord Rubin v. Telemet Am., Inc.,* 698 F.Supp. 447, 451 (S.D.N.Y.1988) ("Section 349 was not adopted to address unique problems that may occur between a solitary con-

**258**

sumer and a merchant."); *Azby Brokerage, Inc. v. Allstate Ins. Co.,* 681 F.Supp. 1084, 1089 (S.D.N.Y.1988) (same); Givens, Practice Commentaries, McKinney's Cons.Laws of N.Y., Book 19, General Business Law § 349, at 565.

Moreover, the term "deceptive practice" in Section 349 is interpreted to mean acts which are dishonest or misleading in a material respect. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995); *Coors Brewing Co. v. Anheuser–Busch Cos.,* 802 F.Supp. 965, 975 (S.D.N.Y.1992). Kramer does not allege that Christie's and Sotheby's actions are dishonest or misleading. According to the complaint, they each informed Kramer of their requirements that the painting receive prior authentication by the Board. Compl. ¶ 15. Consequently, Kramer has failed to plead a claim against Sotheby's or Christie's under Section 349 of the New York General Business Law. Kramer has not alleged that he is a consumer or that the Board or the Foundation are "merchants." Nor has he alleged that he purchased anything from them. While the auction houses may be considered "merchants" they are not trying to sell Kramer anything. To the contrary they worry that Kramer is trying to deceive them into auctioning a painting that may not be authentic. Therefore, the Section 349 claim must be dismissed for failure to state a claim.

### E. *Interference with Advantageous Business Relationships*

In Count 5, Kramer alleges that the defendants unlawfully interfered with his "actual and prospective advantageous business relationships." Compl. ¶¶ 80–84. A claim for interference with "prospective" contractual relations is very difficult to sustain. It must meet requirements " 'more demanding than those for interference with [the] performance of an existing contract.' " *Fine v. Dudley D. Doernberg & Co.,* 203 A.D.2d 419, 610 N.Y.S.2d 566, 567 (2d Dept.1994). Such a cause of action "does not lie absent an allegation that the action complained of was motivated solely by malice or to inflict injury by unlawful means rather than by self-inter-

est or other economic considerations." *Entertainment Partners Group, Inc. v. Davis,* 198 A.D.2d 63, 603 N.Y.S.2d 439, 440 (1st Dep't 1993) (citation omitted); *accord Kahn v. Salomon Brothers, Inc.,* 813 F.Supp. 191, 195 (E.D.N.Y.1993) ("Under New York law where a defendant's interference is intended even partially to advance its own interests, the misconduct must rise to the level of fraudulent or criminal acts.").

The complaint does not allege that Sotheby's and Christie's refusal to auction paintings not authenticated by the Board is not intended to advance their own legitimate interests. Pursuant to Section 13 of New York's Arts & Cultural Affairs Law, as well as the Uniform Commercial Code, Sotheby's and Christie's warrant the authenticity of works that they sell. Thus, their decision only to sell works approved by the Board as genuine Pollocks is motivated by fear of breach of warranty actions if a work is determined to be a fraud. As a result, Kramer has failed to allege, as he must, that Sotheby's and Christie's actions are "motivated solely by malice or to inflict injury by unlawful means, rather than by self-interest or other economic considerations." *Entertainment Partners,* 603 N.Y.S.2d at 440.

Additionally, a claim for interference with advantageous business relationships must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior. *PPX Enters., Inc. v. Audiofidelity Enters., Inc.,* 818 F.2d 266, 269 (2d Cir.1987). Kramer has completely failed on this score. The complaint refers generally to potential contracts with galleries and dealers that allegedly would be willing to sell Kramer's painting, and to various unnamed individuals and entities who would bid on the painting but for defendants' allegedly improper conduct. These allegations do not identify an existing contract. Therefore, claim 5 must be dismissed.

### F. *The Sanctions Motions*

The defendants moved for an order imposing sanctions, pursuant to Rule 11(b) of Federal Rules of Civil Procedure, against Kramer's counsel, Carl E. Person, for his failure to

make a reasonable inquiry into the factual bases for the claims asserted in the complaint. In dismissing this complaint as a matter of law, this Court has not made an assessment of the accuracy of the complaint's factual allegations. Rather, as is required on a motion to dismiss, the Court accepted as true all factual allegations in the complaint, and drew inferences from these allegations in the light most favorable to the plaintiff. *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. To hold an evidentiary hearing or scrutinize conflicting affidavits for the truth of the allegations and determine whether Persons sufficiently investigated them would, in my view, waste scarce judicial resources. In light of the dismissal of this action, defendants' motion for sanctions is denied as moot.

### Conclusion

For the reasons set forth above, defendants' motions to dismiss are granted and the complaint is hereby dismissed. Defendants' motions for sanctions are denied.

**SO ORDERED.**