COMMERCIAL DATA SERVERS, INC., d/b/a Xbridge Systems, Inc., Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.

International Business Machines Corporation, Counterclaim–Plaintiff,

v.

Commercial Data Servers, Inc., d/b/a Xbridge Systems, Inc., Counterclaim–Defendant.

No. 00 CIV. 5008(CM) (LMS).

United States District Court, S.D. New York.

Oct. 5, 2001.

MEMORANDUM DECISION AND OR-
DER GRANTING DEFENDANT'S
MOTION TO DISMISS

McMAHON, District Judge.

Plaintiff and counterclaim-defendant
Commercial Data Servers, Inc. ("CDS")
sues defendant and counterclaim-plaintiff
International Business Machines Corpora-

tion ("IBM") for violations of federal and state antitrust laws, tortious interference with prospective business advantage, unfair competition, and misappropriation.

This case comes to me from Part 1 of the Southern District of New York. On March 21, 2001, Judge Stanton issued an order dismissing plaintiff's claims for breach of contract, unfair competition, and misappropriation, with leave to replead. *Comm. Data Servers, Inc., d/b/a XBridge Systs., Inc. v. Int'l Bus. Machines Corp.*, No. Civ. A. 00–5008, 2001 WL 277303 (S.D.N.Y. Mar.21, 2001). Plaintiff filed an Amended Complaint on May 8, 2001, realleging two of the three counts dismissed by Judge Stanton. Plaintiff has abandoned the breach of contract claim.

IBM now moves to dismiss the First Amended Complaint in its entirety for failure to state a claim under Fed.R.Civ.P. 12(b)(6).

## FACTUAL BACKGROUND

Among the products manufactured by IBM is the "P/390" card, which may be added to certain computer systems, thereby enabling them to run the IBM S/390 operating system software. IBM has built and marketed its own computer systems containing the P/390 card. IBM also has sold these cards to other technology companies, called original equipment manufacturers ("OEMs"), which in turn integrate the P/390 cards into their own computer systems and market those systems under their own names.

On or about October 17, 1995, CDS and IBM executed an Agreement for Purchase of IBM Products (the "OEM Agreement"). Subject to certain terms and conditions set forth therein, the OEM Agreement permitted CDS to purchase from IBM, among other products, IBM's P/390 card. On or about February 3, 1998, the OEM Agreement was amended to permit CDS also to purchase IBM's P/390E card, which was an enhanced version of the P/390 card.

On or about October 6, 1997, CDS and IBM signed an Original Provider Agreement. (the "OPA Agreement"). Under the terms of the OPA Agreement, IBM agreed to provide goods and services to CDS to assist CDS in its development of a computer system using the P/390E card. In exchange, CDS agreed to pay IBM a fee of $600,000. The terms of the OPA Agreement are incorporated by reference in the Amended Complaint. (Am.Compl. ¶¶ 11, 15, 104.)

As a result of the OPA Agreement, CDS developed the CDS 2000E, a server that would operate the S/390 system. One of the services IBM agreed to provide was an engineering verification test of the P/390E card in CDS's prototype computer system in order to verify the functionality of the P/390E card in that system. CDS provided IBM one of its prototypes for testing.

In May 1998, IBM announced two new products, the enhanced PC Server/390, and the IBM S/390 Integrated Server. Plaintiff alleges that these new products utilized innovations CDS had developed and that were part of the CDS machine lent to IBM for testing. (Am.Compl. ¶ 17.) Plaintiff contends that, prior to the Agreement, the CDS 2000E had a Full S/390 processor system and ran full e-business software products, while IBM's PC/Server 330 lacked a full S/390 processor and system, and was used for in-house software development only. After IBM allegedly learned of the CDS technology, plaintiff claims that the IBM incorporated products and technology that it had not previously included in its S/390. Plaintiff further alleges that IBM closed CDS's distribution channels to independent value added resellers ("VARs") by telling them that they would incur negative consequences if they were to sell CDS machines.

Plaintiff argues that IBM (1) misappropriated CDS's development for its own benefit and without compensating CDS; (2) violated state and federal antitrust laws by engaging in anticompetitive conduct; and (3) tortiously interfered with prospective business relations.

Defendant responds that the newly pleaded claims (Counts VIII and IX of the Amended Complaint) still fail to identify what products or technology IBM misappropriated, and still fail to identify CDS's alleged property interest in that which was allegedly misappropriated. IBM further argues that the claims for violations of federal and state antitrust laws (Counts I through VI) should be dismissed because the Amended Complaint fails to provide specific factual allegations justifying CDS's exceedingly narrow market definition. Finally, IBM contends that the claim for tortious interference with prospective business advantage (Count VII) should be dismissed because the Amended Complaint does not identify the specific prospective business relationships with which IBM allegedly interfered.

For the reasons stated below, defendant's motion to dismiss is granted, with prejudice as to some claims and without prejudice as to others.

## DISCUSSION

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff. The Court is required to read a complaint generously, drawing all reasonable inferences from the complaint's allegations. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." *Frasier v. General Electric Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). The Court must deny the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Stewart v. Jackson & Nash,* 976 F.2d 86, 87 (2d Cir.1992) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### 1. Unfair Competition Claim

Plaintiff alleges that IBM used CDS's developments for its own benefit and without compensating CDS.

Under New York law, an unfair competition claim "must be grounded in either deception or appropriation of the exclusive property of the plaintiff." *H.L. Hayden Co. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1025 (2d Cir.1989). The "essence" of an unfair competition claim " 'is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.' " *Eastern Am. Trio Prods., Inc. v. Tang Elec. Corp.,* 97 F.Supp.2d 395, 420 (S.D.N.Y.2000) (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34 (2d Cir.1995)). In order properly to allege the misappropriation aspect of an unfair competition claim, a plaintiff is required to plead "(1) acts or omissions by defendants that proximately caused a misappropriation, and (2) the property or benefit misappropriated." *Data Broad. Corp. v. Tele-Communications, Inc.,* No. Civ. A. 92–4840, 1992 WL 350624, at *4 n. 4 (S.D.N.Y. Nov. 19, 1992) (quoting *Volvo North Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 57 (2d Cir.1988)).

Judge Stanton dismissed CDS's original unfair competition claim for failing to sufficiently identify the innovations or develop-

ments to "allow the reader to understand what specifically was misappropriated and to evaluate CDS's property rights in it." *Comm. Data,* 2001 WL 277303, at *1. Defendant contends that the Amended Complaint still does not identify what property of CDS specifically was misappropriated by IBM.

Plaintiff claims that IBM gathered knowledge of CDS's proprietary technology during the testing phase of the CDS 2000 and used that technology to convert its PC/Server 330 into the S/390 integrated server. (First Amended Compl. ¶ 19.) Plaintiff names the following technologies allegedly misappropriated by IBM: a full S/390 processor and system running full e-business software products; a full N+1 power system; the capability of acting as a full replacement for the IBM 43XX, 92XX and 93XX; full RAID–5 redundancy; an integrated battery backup; three channel adaptors; and "full customer support." (Id. at ¶¶ 18–26.)

■ While there appear to be similarities between the CDS and IBM servers, plaintiff has not specifically alleged that IBM actually incorporated any exclusive property of CDS into its server. IBM's use of the S/390 processor and system could hardly qualify as an innovation or technology proprietary to CDS, since the S/390 is an IBM Product that CDS was licensed to use. Similarly, the inclusion of "e-business software" in the CDS system—without further identification of it as purportedly CDS software—can hardly be assumed to be proprietary to CDS. Plaintiff also does not (and presumably cannot) claim that the N+1 power system, RAID–5 redundancy, channel adaptors, battery back up, and "customer support" are proprietary to CDS. Similarities between CDS's product and the competing IBM product, without more, do not state a claim that IBM appropriated plaintiff's exclusive property.

■ To the extent that plaintiff argues that this package of non-proprietary products and technologies were its exclusive property because CDS filed a patent application on June 30, 1997 for "Novel Computer Platform Connection Utilizing Virtual System Bus," that argument fails. As a matter of law, a patent application does not grant any exclusive rights; only a patent does. *See Marsh v. Nichols, Shepherd & Co.,* 128 U.S. 605, 612, 9 S.Ct. 168, 32 L.Ed. 538 (1888) ("Until the patent is issued, there is no property right"). The Amended Complaint does not allege that CDS's patent application ever resulted in the issuance of a patent.

Plaintiff's allegations, on their face, do not plead ownership of any proprietary data or technological innovation that could possibly have been misappropriated by IBM. Accordingly, Count VIII is dismissed. Since CDS has now had two opportunities to state a proper cause of action, and has failed to do so, this count is dismissed with prejudice. *See In Re Nokia Corp. Sec. Litig.,* No. Civ. A. 96–3752, 1998 WL 898334, at *6 (S.D.N.Y. Dec. 22, 1998) ("When the plaintiff is put on notice of the deficiencies in his complaint and fails to correct them in the amended complaint ... dismissal with prejudice is proper.").

## 2. Misappropriation

Count IX of the First Amended Complaint is also premised on the alleged misappropriation of CDS technology by IBM (Am.Compl. ¶¶ 103–106.) As explained above, CDS has failed to particularize its protected property rights in any of the purported "innovations" it alleges. This claim also is dismissed with prejudice.

## 3. Antitrust Claims

Defendant argues that Counts I through VII of the Amended Complaint, alleging

violations of Section 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, and Section 340 of the New York General Business Law, should be dismissed due to plaintiffs' failure to properly allege a relevant market.

■ In order to state an antitrust claim, "plaintiff must allege a relevant product market in which the anti-competitive effects of the challenged activity can be assessed." *Carell v. Shubert Org., Inc.*, 104 F.Supp.2d 236, 264 (S.D.N.Y.2000). The defined market must be supported in the complaint by a "theoretically rational explanation" for why the boundaries of the market are defined as they are. *Int'l Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 893 F.Supp. 1207, 1213 (S.D.N.Y. 1994), *aff'd*, 62 F.3d 69 (2d Cir.1995).

■ Because a relevant market includes all products which are reasonably interchangeable, *Re–Alco Indus., Inc. v. National Ctr. for Health Educ., Inc.*, 812 F.Supp. 387, 391 (S.D.N.Y.1993) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)), a plaintiff's "failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal." *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162 (S.D.N.Y. 1995); *Int'l Audiotext Network, Inc. v. AT & T*, 893 F.Supp. 1207, 1213 (S.D.N.Y. 1994) ("[A]n antitrust plaintiff must set out a theoretically rational explanation to support its proposed relevant product market"). In addition, to state an antitrust claim, the alleged product market must be plausible. *See B.V.*, 909 F.Supp. at 171 (S.D.N.Y.1995); *Deep South Pepsi–Cola Bottling Co. v. Pepsico, Inc.*, No. Civ. A. 88–6243, 1989 WL 48400, at *7 (S.D.N.Y. May 2, 1989) ("The federal courts, in the context of Rule 12 motions to dismiss, have not hesitated to reject market allegations that make no economic sense under any set of facts").

In particular, the explanatory allegations must take into account both the " 'product market, those commodities or services that are reasonably interchangeable by consumers for the same purposes, and a geographic market, the area in which sellers of the relevant product effectively compete.' " *Smith & Johnson v. Hedaya Home Fashions, Inc.*, No. Civ. A. 96–5821, 1996 WL 737194 at *5 (S.D.N.Y. Dec. 26, 1996) (quoting *Sunshine Cellular v. Vanguard Cellular Sys., Inc.*, 810 F.Supp. 486, 493 (S.D.N.Y.1992)). Further, the supporting allegations must specifically address reasonable interchangeability by "reference to cross-elasticity of demand and the similarity of purpose and clientele of each product." *Smith & Johnson*, 1996 WL 737194, at *5. Dismissal is appropriate "[i]f a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand." *Re–Alco Indus. Inc.*, 812 F.Supp. at 391; *see also E & G Gabriel v. Gabriel Bros., Inc.*, Civ. No. 93–0894, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) (failure to define market "by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal").

Courts have granted motions to dismiss where plaintiffs failed to allege cross-elasticity of demand or reasonable interchangeability in their complaint. *See B.V.*, 909 F.Supp. at 171; *Smith & Johnson*, 1996 WL 737194 at *1. In *B.V.*, a developer of chest equalization radiography technology sued a competitor for attempted monopolization under Section 2 of the Sherman Act. Plaintiffs' complaint stated that: "[t]he relevant market is chest equalization radiography," and that "at all relevant times, no persons other than the parties

hereto have had the capacity to provide chest equalization radiography equipment in the United States." *B.V.*, 909 F.Supp. at 171. The Court dismissed the case because of plaintiff's failure to define the relevant market. Plaintiffs' pleadings did not refer to any reasonably interchangeable alternatives, nor did they offer an explanation for why they defined the relevant product market in such narrow terms. *Id.*

Similarly, in *Smith & Johnson*, 1996 WL 737194 at *1, plaintiff was a designer of patterns for use on its afghans. Plaintiff asserted copyright, tortious interference, and unfair competition claims against defendant for allegedly marketing and selling afghans with a confusingly similar label. *Id.* Plaintiff defined the market as "the field of manufacturing, marketing and selling afghans to wholesale customers." *Id.* at *6. The court granted defendant's 12(b)(6) motion and dismissed plaintiff's monopolization claim for failure to properly define a relevant market and failure to allege facts from which a dangerous probability of defendants monopolizing the proposed market could be inferred. *Id.* at *5. In assessing the relevant market, the court concluded that plaintiff failed to justify its proposed product market by reference to other reasonably interchangeable products. It stated: "[N]owhere in the complaint did plaintiff explain why afghans are not interchangeable with other similar products, e.g., quilts, spreads, blankets and comforters, and why afghans constitute their own market." *Id.* Because plaintiff made no allegations regarding the cross elasticity of demand for afghans and these similar products, the court dismissed the complaint. *Id.; see also Theatre Party Assocs., Inc. v. Shubert Org.*, 695 F.Supp. 150, 154–55 (S.D.N.Y.1988) (dismissing antitrust claims where complaint did not explain why market was limited to "the most popular Broadway shows" and excluded "other forms of entertainment, namely oth-

er Broadway shows, the opera, ballet, or even sporting events.")

In the case at bar, CDS defines the relevant market as follows:

> "The relevant product market is S/390 compatible mainframes. A relevant product submarket is replacements for older S/390 compatible IBM mainframes which had to be replaced by the year 2000."

(Am.Compl. ¶ 37.) CDS defines "mainframe" as "a single location processor which provides computing services to multiple workstation terminals and uses the IBM operating system (OS/390)." (Id. at ¶ 38.) CDS further alleges that the relevant geographic market is limited to the United States. (Id. at ¶ 36.)

■ CDS has failed to allege any facts explaining why computers other than "mainframes" should be excluded from the relevant product market. There are many types of computers other than "mainframes" (e.g. PCs, workstations, and servers), but the Amended Complaint does not explain why these other types of computers would not be functionally interchangeable with, and/or exhibit cross-elasticity of demand for "mainframes." CDS also has failed to allege any facts explaining why the relevant market is limited to mainframes compatible with IBM's licensed "S/390" operating system. There are many operating systems other than that system—and the Amended Complaint does not address why those other systems would not be reasonably interchangeable with the S/390 operating system. Finally, CDS has failed to allege any facts explaining why the relevant geographic market is domestic rather than worldwide. CDS sells its products both in the United States, and abroad.

Absent an appropriately defined market, it is impossible for this Court to assess the anticompetitive effect of the challenged

practices. *See Re–Alco Indus., Inc.*, 812 F.Supp. at 392. Counts I–VI are therefore dismissed without prejudice.

4. Tortious Interference With Prospective Business Relations

Count VII is a claim for tortious interference with prospective business relations.

 Under New York law, the elements of a claim for tortious interference with prospective business relations are: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." *Nadel v. Play–By–Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000). Plaintiff must specify "some particular, existing relationship through which plaintiff would have done business but for the allegedly tortious behavior." *Allcar Motor Parts Corp. v. Federal–Mogul Corp.*, No. Civ. A. 96–4419, 1998 WL 671448, at *6 (S.D.N.Y. Sept. 29, 1998) (quoting *Kramer v. Pollock–Krasner Foundation*, 890 F.Supp. 250, 258 (S.D.N.Y.1995)). A "general allegation of interference with customers without any sufficiently particular allegation of interference with a specific contract or business relationship" does not state a claim. *Envirosource, Inc. v. Horsehead Res. Dev. Co.*, No. Civ. A. 95–5106, 1996 WL 363091, at *14 (S.D.N.Y. July 1, 1996).

CDS alleges that in its effort to use its market dominance to close existing distribution channels, IBM intimidated value-added resellers ("VARs") into not selling the CDS product. The complaint refers only generally to CDS's alleged relationships with "VARs," without identifying any particular "VARs." (Am.Compl. ¶¶ 96–98). That allegation is far too vague to support a claim for tortious in-terference. *See, e.g., Minnesota Mining Mfg. Co. v. Graham–Field, Inc.*, No. Civ A. 96–3839, 1997 WL 166497, at *7 (S.D.N.Y.1997) (dismissing claim where claimant alleged interference with business relations with its "customers" without identifying any specific customers); *Kramer*, 890 F.Supp. at 258 (dismissing tortious interference claim where plaintiff alleged interference with potential contracts with "galleries", "dealers" and "unnamed individuals and entities" without identifying any of them specifically).

Count VII is therefore dismissed without prejudice.

## CONCLUSION

For the foregoing reasons defendant's motion to dismiss is granted. Counts I through VII are dismissed without prejudice; Counts VIII and IX are dismissed with prejudice.