24 HOUR FITNESS USA, INC., Plaintiff,

v.

24/7 TRIBECA FITNESS, LLC, et al., Defendants.

No. 03 Civ. 4069(RLE).

United States District Court, S.D. New York.

Aug. 7, 2006.

See also, 2006 WL 1881763.

Ronald Gustav Blum, Manatt, Phelps & Phillips, LLP, New York City, Kevin G. Smith, Sughrue Mion P.L.L.C., Washington, DC, Matthew Hearle, Goldberg, Weprin & Ustin LLP, New York City, W. Mack Webner, Sughrue Mion Zinn McPeak & Seas, Washington, DC, for Plaintiff.

Matthew Hearle, Goldberg, Weprin & Ustin LLP, New York City, for Defendants.

## OPINION & ORDER

ELLIS, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiff, 24 Hour Fitness ("24 Hour"), brought the following claims against defendants 24/7 Tribeca Fitness, LLC ("24/7"), 24/7 Gym, LLC, Peter Williams

("Williams"), and Peter Williams Enterprises: trademark infringement under 15 U.S.C. § 1114(a); false designation of origin and unfair competition under 15 U.S.C. § 1125(a); trademark dilution under 15 U.S.C. § 1125(c); cybersquatting under 15 U.S.C. § 1125(d); injury to business reputation and dilution under New York General Business Law § 360–1; making false and misleading statements under New York General Business Law § 350; and common law trademark infringement and unfair competition. Pursuant to 28 U.S.C. § 636(c), the parties consented to the trial of this matter before the undersigned. A bench trial was held from April 24–26, 2006, and the parties submitted post-trial briefs shortly thereafter. For the reasons discussed below, the Court finds that 24 Hour has not established a likelihood of confusion between the two marks at issue and is not entitled to relief on its claims. Judgment is therefore entered for defendants.

## II. BACKGROUND

### A. 24 Hour Fitness

24 Hour is a chain of physical fitness facilities based in San Ramon, California, operating under the trademark "24 Hour Fitness." Updated Joint Pretrial Order, Stipulated Facts ("SF") ¶ 1. The company was founded in 1983 and originally operated under the mark "24 Hour Nautilus." Id. ¶ 2. 24 Hour began using "24 Hour Fitness" in August 1996. Id. ¶ 7. The company has expanded such that it now operates five facilities in Asia and more than three hundred and fifty 24 Hour Fitness gyms in fifteen states, two of which are east of the Mississippi River. Id. ¶¶ 12–13; Trial Transcript ("Tr.") at 56; Defendants' Exhibit ("DX") A. There are over 2.8 million current members of 24 Hour Fitness, and the company has sold over 8 million memberships. SF ¶ 14.

The closest facilities to New York are in Missouri and Tennessee. Tr. at 61. There are six thousand 24 Hour members on the East Coast, twelve hundred of whom live in New York State and six hundred in New York City. Tr. at 39. 24 Hour offers a range of fitness services, including cardio and strength training machines, free weights, locker rooms, personal trainers, racquetball, basketball, swimming, saunas, massage, and classes in yoga, aerobics, tai chi, kick-boxing, and cycling. SF ¶¶ 17–18.

24 Hour owns nineteen federally registered marks containing 24 Hour Fitness and 24 Hour, for, among other things, health clubs, clothing, backpacks, gym bags, nutrition and exercise books, physical fitness instruction, and charitable services. Plaintiff's Exhibit ("PX") 1–24; see SF ¶¶ 22–27 (listing 24 Hour's trademark registrations). The mark for "24 Hour Fitness" has been in continuous use for over five consecutive years. SF ¶ 28. Upon its application for registration, the United States Patent and Trademark Office did not require a showing of secondary meaning. Id. ¶ 29.

24 Hour has been quite successful in recent years, earning nearly $1 billion in net revenues in 2003, for example. SF ¶ 31. In the past five years, the company has spent over $40 million in print advertising, $80 million in television advertising, and $10 million in radio advertising. Id. ¶¶ 33–35. 24 Hour is a sponsor of the United States Olympic Team, has upgraded the Olympic Training Center in Lake Placid, New York, id. ¶¶ 36–37, and has sponsored a number of professional and collegiate sports teams. Id. ¶¶ 38–39. 24 Hour operates a website, has been featured on national television shows, and has accrued various celebrity endorsements. Id. ¶¶ 40–42. Four celebrity athletes— Magic Johnson, Shaquille O'Neal, Andre Agassi, and Lance Armstrong—have col-

laborated with the company to establish co-branded fitness facilities. *Id.* ¶¶ 43–46. Each co-branded facility features the name of the athlete prominently displayed directly beneath the name "24 Hour Fitness." *See* PX 217 (24 Hour Fitness Magic Johnson—Sport), 251 (24 Hour Fitness Agassi—Super Sport), 510 (24 Hour Fitness Shaq); Tr. at 46.

24 Hour has been involved in a large number of enforcement actions defending its mark. SF ¶¶ 47–51; Tr. at 124–25. Of note, 24 Hour obtained permanent injunctions enjoining the use of 24/7 Fitness and 24/7 Gym in North Carolina and Michigan in 2002. SF ¶ 48. Both of these were consent judgments. *See, e.g.,* PX 274, 276; Tr. at 125–27. In fact, this is the first of 24 Hour's enforcement actions to end with an adjudication on the merits. Tr. at 183.

### B. 24/7 Fitness

24/7 Fitness Club operates two facilities in New York City, one at 105 Chambers Street, called the "Tribeca Club," and one at 47 W. 14th Street, called the "14th Street Club." SF ¶¶ 53, 55. The clubs began to use the term "24/7" between February and April 2001. *Id.* ¶¶ 54, 56. Defendant Peter Williams ("Williams") owns and operates the 14th Street Club. *Id.* ¶ 59. Wahday Washington ("Washington") and Williams together own and operate the Tribeca Club. *Id.* ¶ 60. Washington and Earl Wilson ("Wilson") owned and operated a third club on 17th Street, *id.* ¶ 61, which no longer exists. Williams had an ownership interest in the equipment of the 17th Street Club. *Id.* ¶ 62. 24/7's clubs offer cardio and strength training machines, free weights, classes in aerobics and yoga, and locker rooms. *Id.* ¶ 63. The company provides personal trainers on an independent contractor basis. *Id.* ¶ 64.

In July 2002, by letter, 24 Hour contacted 24/7 and asked that they terminate their use of the 24/7 Fitness name. *Id.* ¶ 71. 24 Hour sent another letter in August 2002, *id.* ¶ 72, but 24/7 continued to use and advertise the name. The instant case was filed on June 4, 2003. 24 Hour moved for a preliminary injunction, which was denied by District Judge Laura T. Swain on August 18, 2003. *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,* 277 F.Supp.2d 356 (S.D.N.Y.2003). The parties consented to jurisdiction before the undersigned on August 27, 2003. Both parties moved for summary judgment, which was denied on April 28, 2005. *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,* 2005 WL 991767 (S.D.N.Y. Apr. 28, 2005). The parties proceeded to trial approximately one year later.

## III. DISCUSSION

### A. Claim of Trademark Infringement Under the Lanham Act

■ The Lanham Act protects trademark owners against confusion as to "affiliation, connection, or association" in the marketplace. 15 U.S.C. § 1125(a)(1)(A). The components of a trademark infringement claim are a showing that 1) the plaintiff owns a valid mark that merits protection, and 2) the defendant's mark results in a likelihood of confusion between the two marks. *Brennan's, Inc. v. Brennan's Rest., L.L.C.,* 360 F.3d 125, 129 (2d Cir. 2004).

#### 1. Protectable Mark

■ The protection afforded a mark depends on the degree of its distinctiveness. The five classic categories, from least distinctive to most distinctive, are labeled: 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; or 5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put. A mark is suggestive if it merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods. An arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark.

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999).

24 Hour's mark is perhaps most aptly described as descriptive, even though spokespersons for the company contend that the intended message is not simply to advertise that the facilities are open twenty-four hours a day. CEO Mark Mastrov ("Mastrov") testified, "Our philosophy was around lifestyle . . . making our clubs very inclusive of all walks of life, ages, sizes, shapes, creeds." Tr. at 34; *see id.* at 53–55. The company's broader message could qualify the mark as, at best, suggestive.

Regardless of the mark's classification, because it has been registered and in continuous use for over five years, 24 Hour's trademark is incontestable by operation of law under 15 U.S.C. §§ 1065 and 1115. *See Brennan's*, 360 F.3d at 130. Once a mark becomes incontestable, registration is "conclusive evidence of the validity of the registered mark and . . . of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b). Such registration also creates a presumption that 24 Hour's mark is inherently distinctive. *Lane Capital*, 192 F.3d at 345. Were defendants to attempt to rebut the presumption of protectability afforded by 24 Hour's registration, it would be their burden to prove that the plaintiff's mark was invalid by a preponderance of the evidence. *Id.* Here, defendants have not sought to do so. However, to succeed on its claims, 24 Hour must still prove that 24/7's use of the same or similar term in a particular context causes a likelihood of confusion between the two marks. *See KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117, 125 S.Ct. 542, 160 L.Ed.2d 440 (2004).

## 2. Likelihood of Confusion

The Second Circuit employs a "multi-factor test," established in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961), to evaluate the likelihood of confusion in trademark infringement cases. *See Brennan's*, 360 F.3d at 130. "This test requires analysis of several non-exclusive factors, including: (1) the strength of the mark, (2) the degree of similarity between the two marks, (3) the competitive proximity of the products, (4) actual confusion, (5) the likelihood the plaintiff will bridge the gap, (6) the defendant's good faith in adopting its mark, (7) the quality of the defendant's products, and (8) the sophistication of the purchasers." *Id.; see Polaroid*, 287 F.2d at 495. While no factor is dispositive, the "ultimate question" is the "likelihood of confusion as to the source of the product." *Brennan's*, 360 F.3d at 130 (*quoting Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986)).

### a. Strength of the 24 Hour Mark

"The strength of a mark refers to its ability to identify the source of the goods . . ." *Id.* This analysis has two components: 1) "inherent distinctiveness" of a mark, and 2) "the distinctiveness the mark has acquired in the marketplace." *Id.* at 130–31.

### (1) Inherent Distinctiveness

■ Because 24 Hour's trademark is incontestable as a matter of law, it is presumed inherently distinctive. *Lane Capital,* 192 F.3d at 345. Furthermore, 24 Hour demonstrated at trial that since 1996, the company has spent hundreds of millions of dollars in national advertising to promote its mark, PX 78–79, 81–82, 86, 501, which "bolsters" its strength. *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 139 (2d Cir.1999); *see Lexington Mgmt. Corp. v. Lexington Capital Partners,* 10 F.Supp.2d 271, 280–81 (S.D.N.Y.1998). 24 Hour uses various forms of media for advertising and promotion and also promotes its marks through signage and sponsorship of major sporting events, including the Olympics. PX 100, 109–12, 117, 124–26, 220–23, 230–32, 458, 508, 514, 516, 519–20, 524–25, 533, 547 (Summary of 24 Hour Fitness Advertising and Promotion); Tr. at 77–78, 79–86, 97–98. The company operates a website which averages over 34,000 daily hits. Tr. at 94–95; PX 538. 24 Hour has also received unsolicited media attention, Tr. at 103–07; PX 147, 239, 546 (Summary of 24 Hour Fitness Unsolicited Press), which demonstrates its level of national recognition. *See Tri–Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339, 349–50 (S.D.N.Y. 1998). 24 Hour's partnerships with nationally known athletes have generated additional media attention. Tr. at 40–41, 52, 57, 102; PX 237, 239, 242, 488. The company's sales from its clubs have amounted to over $1 billion per year since 2004. PX 544 (Net Revenues). In addition, as noted above, 24 Hour has successfully policed its mark, which adds to its strength. *See Morningside,* 182 F.3d at 139.

Despite this extensive promotion and the presumption of distinctiveness afforded by the mark's incontestability at law, 24 Hour faces an uphill battle in establishing that a phrase so commonly used in business is inherently distinctive. "[T]he more common the word and the more commonplace the manner of its usage in a trademark, the more difficult it is to displace the word's conventional significance so that it will be associated primarily in the public eye with the product." *Procter & Gamble Co. v. Johnson & Johnson Inc.,* 485 F.Supp. 1185, 1197 (S.D.N.Y.1979), *aff'd,* 636 F.2d 1203 (2d Cir.1980) (finding the strength of the plaintiff's trademark for the word "Sure" on deodorant to be "at best moderate" despite evidence of extensive revenue-generating advertising and promotion).

While the phrase "24 hour" is obviously common in all areas of commerce, and 24 Hour has not initiated litigation against the myriad of business owners currently using the term, "[t]he owner of a mark is not required to police every conceivably related use thereby needlessly reducing non-competing commercial activity and encouraging litigation in order to protect a definable area of primary importance." *Playboy Enter., Inc. v. Chuckleberry Pub., Inc.,* 486 F.Supp. 414, 422–23 (S.D.N.Y. 1980); *see Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1174 (2d Cir. 1976) ("The record does not contain any evidence to support the claim that plaintiff's trademark was weakened by uses of similar marks by third parties."). In *Playboy,* for example, the court found that the company's choice to settle with "Playgirl" and not to litigate against magazines called "Players" or "Playguy," did not reduce its right to litigate against "Playmen." 486 F.Supp. at 422–23. The court approved of the company's decision to enforce its "right to protection against use of marks with the prefix 'play' in areas of direct competition, the areas most crucial to maintaining its mark's commercial value." *Id.* at 423.

In order to show third-party use in the relevant field of fitness, 24/7 pointed to various hotel websites advertising a "24 hour fitness center." DX B, C. Extensive third-party use of a term "can dilute the strength of a mark." *Lexington*, 10 F.Supp.2d at 281. In particular, third-party use of a mark for similar goods is relevant to "showing a crowded field and that the mark is therefore weak." *Nikon, Inc. v. Ikon, Corp.*, 1992 WL 114509, at *2 (S.D.N.Y. May 1, 1992) (internal quotations omitted); *see, e.g., Nabisco v. Warner–Lambert Co.*, 32 F.Supp.2d 690, 698–99 (S.D.N.Y.1999) (extensive third-party use and/or registration of the term "Ice" within the confections field weakened "Ice Breakers" mark); *Trs. of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 744–45 (S.D.N.Y.1997) (substantial evidence of third-party use of the name Columbia in connection with a variety of businesses, including hospitals, healthcare services, and institutions weakened the mark); *Mondo, Inc. v. Sirco Int'l. Corp.*, 1998 WL 849401, at *6–7 (S.D.N.Y. Dec. 7, 1998) (finding plaintiff's trademark seriously diminished by trademark search which revealed at least twenty-three existing or previously existing applications and registrations for MONDO, covering a wide variety of products and services, and sixteen existing or previously existing registrations or applications for MONDO covering clothing or leather bags of any type). *But see Bear U.S.A., Inc. v. Kim*, 71 F.Supp.2d 237, 255 (S.D.N.Y.1999) (finding little probative value in evidence demonstrating the existence of 225 other applications and registered marks for clothing including the word "bear" when only seven of those were active marks or pending applications using the word on jackets or parkas as plaintiff did).

In turn, 24 Hour demonstrated that the hotels cited by 24/7 do not use the term "24 hour fitness center" on signage or brochures, which would indicate trademark use. PX 558–59; Tr. at 190–91. "The significance of third-party trademarks depends wholly upon their usage." *Scarves by Vera*, 544 F.2d at 1173. In *Lexington*, for example, the defendant had provided telephone directory listings showing that over 125 businesses incorporated the word "Lexington" in their name. 10 F.Supp.2d at 281–82. The court found that this initial evidence of third-party use was not competent for consideration on a motion for a preliminary injunction because it did not demonstrate that the marks listed were actually used by third-parties, well promoted, or recognized by consumers. *Id.* at 282. The court required the parties to submit supplemental evidence in the form of a trademark search report. *Id.* Ultimately, the court found that the plaintiff's mark was not weakened by third-party usage because only seven businesses were of the same type, and the plaintiff was in the process of exercising its rights against them. *Id.*

In some cases, courts have considered third-party use evidence absent proof of actual use, but have indicated that such evidence is of limited probative value. In *Nikon*, 1992 WL 114509, at *3, in reviewing a motion for preliminary injunction, the court stated that trademark registrations, telephone book entries, advertisements, and photographs did not establish actual third-party usage. The court accepted the evidence "for the limited purpose of showing that third parties consider [the word 'smile'] available for use in connection with both photography and non-photography related services and products." *Id.* The court also noted that "th[e] evidence [did] not establish a crowded field of trademarks and therefore ... [was] of limited probative value in assessing the strength of Ikon's SMILE mark." *Id.* (internal quotations omitted). *Accord Pan*

*American World Airways, Inc. v. Panamerican School of Travel, Inc.*, 648 F.Supp. 1026, 1034 (S.D.N.Y.), *aff'd*, 810 F.2d 1160 (2d Cir.1986). The Court views 24/7's evidence in the same light here. The fact that various hotels advertise a "24 hour fitness center" demonstrates that third parties consider the words available to describe fitness services as open all day. While not demonstrative of a crowded field of similar trademarks, to a certain degree, this weakens 24 Hour's mark.

**(2) Distinctiveness in the Marketplace**

■ The second aspect of the test for strength—distinctiveness in the marketplace—does not assist 24 Hour in demonstrating a particularly strong mark. A party claiming trademark infringement must provide evidence of a mark's strength in the relevant market. In *Brennan's*, which involved a claim that a New York restaurant named "Terrance Brennan's" infringed on a New Orleans restaurant named "Brennan's," the Second Circuit emphasized that the "relevant market" is key to the analysis of the strength of a trademark. 360 F.3d at 132. In that case, the "relevant market [was] the pool of actual and potential customers of Terrance Brennan's[, the defendant], for it is those patrons whose potential confusion [was] at issue." *Id.* The court found that Brennan's national advertising and promotion figures did not necessarily demonstrate that "potential diners *in New York City* who find the word Brennan's on a restaurant awning will have any reason to think the restaurant is connected with Brennan's New Orleans, or even will have heard of Brennan's New Orleans." *Id.* (emphasis in original). In that case, the district court had made no findings related to media exposure or advertising figures specific to the New York City area. *Id. See, e.g., Savin Corp. v. Savin Group*, 2003 WL 22451731, at *9 (S.D.N.Y. Oct. 24, 2003)

("Even though plaintiff's marks may be strong in the market for sophisticated business equipment and services, professional engineering services do not reasonably fall within the broadly defined market of potentially related services."), *vacated in part on other grounds*, 391 F.3d 439 (2d Cir.2004).

Here, the relevant consumer market is also the New York City area, where 24/7 runs its gyms. 24 Hour provided ample evidence of its national advertising and promotion efforts and the resulting revenues in the areas where its facilities are located. However, "the fact that a mark has selling power in a limited geographical or commercial area does not endow it with a secondary meaning for the public generally." *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir.1989); *see Brennan's*, 360 F.3d at 132. 24 Hour's Senior Vice–President of Marketing, Linnel Killus, testified that 24 Hour has done no advertising in New York, or placed any signage in New York stadiums. Tr. at 113. There are only six hundred 24 Hour Fitness members in New York City. *Id.* at 39. 24 Hour's national advertising reaches New York, but that fact alone does not demonstrate that the company has selling power here. While 24 Hour demonstrated that its mark is relatively strong in the areas in which the company has placed its facilities, and that the company has received significant national attention, ultimately this factor weighs against a likelihood of confusion because there was insufficient evidence of strength in the relevant market of New York City.

**b. Similarity Between the Two Marks**

■ There are two components of the similarity factor: "whether the similarity between the two marks is likely to cause

confusion and ... what effect the similarity has upon prospective purchasers." *Sports Auth., Inc. v. Prime Hosp. Corp.,* 89 F.3d 955, 962 (2d Cir.1996). The "analysis focuses on the particular industry where the marks compete." *Brennan's,* 360 F.3d at 133. The appropriate examination requires the court to "appraise the overall impression created by ... the context in which [the marks] are found." *Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 47 (2d Cir.2000) (*quoting Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 744 (2d Cir.1998)). The overall appearance is critical, and a mark must be viewed in "its complete form rather than dissect[ed] into its component parts." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 15 F.Supp.2d 389, 395 (S.D.N.Y.1998). The Second Circuit has recently ruled that a side-by-side comparison of the two marks at issue in an infringement case is inappropriate, and instead, that the marks should be "viewed sequentially in the context of the marketplace." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 117 (2d Cir. 2006) (*citing Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d 532 (2d Cir.2005)). Looking at the two marks side-by-side can be useful in comparing designs, only so long as the focus remains on the ultimate issue of likelihood of confusion. *Id.* at 117.

Here, the two companies obviously share the use of the number "24" and the word "Fitness." 24 Hour's trademark registrations stipulate that no claim is made to the latter word alone. Tr. at 172–73. At the same time, 24 Hour cannot possibly claim sole rights to either "24" or "hour" or even "24 Hour." The mark at issue is "24 Hour Fitness." The sound of the marks is not exactly the same and the way the marks are displayed is somewhat different. 24 Hour uses a stylized script, which has changed to some degree over the years, but the color scheme has remained the same: red, white, and blue. PX 1–5, 257, 458; *see* Tr. at 158. "24 Hour" is written inside a red oval against a blue oval, with "Fitness" written in blue next to it. Tr. at 112. 24/7 does not use a consistent logo, but "24/7 Fitness Club" is always written in block lettering of various colors, often red, but also black and yellow. PX 492. 24/7 also has signage stating "24 Hour Gym" in block letters. *Id.* At one point, 24/7 used an oval design on a t-shirt. PX 429.

While differences in typeface like those here, and a plaintiff's consistent use of one logo in contrast with a defendant's use of various logos, have been found to weigh against a finding of similarity, *see Paco Sport, Ltd. v. Paco Rabanne Parfums,* 86 F.Supp.2d 305, 316 (S.D.N.Y.2000), the two marks do employ similar language and communicate the same message. *See Am. Home Prod. Corp. v. Johnson Chem. Co.,* 589 F.2d 103, 107 (2d Cir.1978) (comparing Roach Motel and Roach Inn). Whether that message is intended to reference time (in the case of 24/7) or lifestyle (in the case of 24 Hour) is insignificant because the common understanding of both terms is the same. Ultimately, the marks are similar enough in appearance and message to weigh towards a possibility of confusion. In particular, when viewed with the marketplace in mind, where a consumer might view one gym's logo on a local building and another at a different time in a national advertisement, this factor favors 24 Hour.

### c. Competitive Proximity of the Products

"The third factor addresses whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source." *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 77 (2d Cir.1988). The key here is the possibility

of confusion in the context in which consumers encounter, and consider purchasing, the parties' products. *See Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 396 (2d Cir.1995). The parties' products are obviously competitive because both companies provide fitness clubs featuring similar services that are usually open to the public twenty-four hours a day. For the most part, 24 Hour's facilities are larger and provide a wider range of services and items for sale, while 24/7's facilities are more limited. SF ¶¶ 16–18, 21, 63, 67–69. Most critically, the companies do not compete directly because the closest 24 Hour facility which is open to the public is located thousands of miles away.

Lack of direct proximity is not dispositive. The focus is on possible confusion as to *source*. *Arrow Fastener*, 59 F.3d at 396 (*citing Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1134 (2d Cir.1982)). Accordingly, the Second Circuit has indicated that consideration of competitive proximity should be in reference to the strength of the plaintiff's mark and similarity between the two marks. *Id.* The court addressed an analogous situation in *Brennan's*, noting that the "strength analysis can inform [the] proximity analysis." 360 F.3d at 135. As the court recognized there, "[i]t is well established that a geographically remote mark may nevertheless gain protection in a distant market, at least where there is extensive advertising or evidence of strong reputation in the distant market." *Id.* at 134. In that case, the court found insufficient likelihood of confusion and concluded that the geographic separation of 1000 miles between the two restaurants was critical, emphasizing that "[e]ven in this age of rapid communication and travel, plaintiff faces a high hurdle to demonstrate that a single restaurant in New Orleans and a single restaurant in New York City compete for the same customers." *Id.*

24 Hour is a chain, not a single facility, and its members could travel to New York and expect to find its gyms there. It is therefore *possible* that 24 Hour and 24/7 could "compete for the same customers," *id.*, and that, given the similar message communicated by the companies' respective marks, a 24 Hour member might, at first glance, wonder if the two were connected. Mastrov testified that 24 Hour members "could have a home in Miami and a home in Manhattan," indicating some "crossover," Tr. at 63, but there was no concrete evidence of this aside from Mastrov's speculation. Courts, however, do not always require clear demographic evidence to recognize some crossover in parties' consumer bases. For example, in *Diner, Inc. v. Dream Kitchen, Inc.*, the court noted that residents of upper Manhattan, defendant's customer base, travel 100 miles away to Suffolk County, plaintiff's location, for vacation, even though the plaintiff had not provided any demographic evidence. 1995 WL 438627, at *6 (S.D.N.Y. July 24, 1995). The court concluded that this fact weighed towards a finding of competitive proximity, in favor of the plaintiff. In this case, however, based on the demographic evidence that has been provided, the Court does not find that the plaintiff merits the same treatment as in *Diner*. 24 Hour has only 600 members in New York City and has not provided any statistics about the number of its other members who regularly travel here. The Court cannot surmise, as the court did in *Diner*, about whether the number of 24 Hour members who travel here would be "appreciable." *Id.* Most critically, 24 Hour has not demonstrated that its mark is strong here, an entirely appropriate consideration in relation to the competitive proximity factor according to the Second Circuit in *Arrow Fastener* and *Brennan's*, although not considered in this

context by the court in *Diner.* Given the geographic separation and the differences that do exist between the parties' services, the Court finds there is insufficient competitive proximity to weigh towards a likelihood of confusion.

### d. Likelihood that the Senior User will Bridge the Gap

■ The appropriate question for the fourth factor is whether the plaintiff is likely to enter defendant's area of business or whether the average consumer would perceive that possibility as likely. *See Federal Express Corp. v. Federal Espresso, Inc.,* 1998 WL 690903, at *16 (N.D.N.Y. Sept. 30, 1998). "This factor is designed to protect the senior user's 'interest in being able to enter a related field at some future time.'" *W.W.W. Pharm, Co. v. Gillette Co.,* 984 F.2d 567, 574 (2d Cir.1993) (*quoting Scarves by Vera,* 544 F.2d at 1172). Speculative intentions do not demonstrate that bridging the gap is likely, and a plaintiff should provide evidence of concrete plans. *See, e.g., Horn's, Inc. v. Sanofi Beaute, Inc.,* 963 F.Supp. 318, 325 (S.D.N.Y.1997) (finding no likelihood that plaintiff, a fashion industry consultant and magazine publisher, would market a perfume where there was no evidence of such plans on the record); *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 579, 582 (2d Cir.1991) (plaintiff's claim that it had "considered" publishing self-help guides had not crystalized, was speculative, and did not demonstrate a likelihood of entering the defendant's market).

24 Hour's intent to someday enter the New York market was clear at trial. The company has, for a number of years, been exploring the market, has bid on several buildings, toured possible sites, signed letters of intent to purchase existing gyms, and developed marketing plans. Tr. at 43–45. While company executives testified

that 24 Hour has no specific plans in the acquisition process at this time, *id.* at 59–60, the company is clearly expanding rapidly nationwide. Mastrov testified, however, that the events of the terrorist attacks in New York City on September 11, 2001, had slowed the company's progress because 24 Hour decided to first ascertain the extent of the New York market's recovery after the incident. Tr. at 65. He also indicated that the instant litigation had deterred their immediate commitment to a New York location. *Id.* at 47, 65, 68.

One fact does temper the conclusion that this factor weighs in 24 Hour's favor: the record shows that the facility 24 Hour is most likely to open in New York would be co-branded with the basketball star Magic Johnson. *Id.* at 43, 47, 67–68. Such a facility, in light of the other factors analyzed thus far, would not risk likelihood of confusion given the distinct celebrity association and the actual difference in the name of the facility itself. *See* PX 217 (showing that the name of a current co-branded facility is 24 Hour Fitness Magic Johnson—Sport). The likelihood of bridging the gap requires both a consideration of the plaintiff's intent to expand and of the type of services or products likely to be offered. *See Diner,* 1995 WL 438627, at *7 (finding plaintiff likely to bridge the gap because it had entered into a lease in the relevant area and the services it intended to provide would compete with defendant). Therefore, while there is a definite likelihood that 24 Hour will enter 24/7's market, the fact that its planned facility may be quite distinct from defendant's facility renders this factor neutral.

### e. Actual Confusion

■ Evidence of actual consumer confusion is strong evidence of a likelihood of confusion. *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259 (2d

Cir.1987). "Even if the movant shows actual confusion by only a small percentage of buyers, he may sustain his case based on the inference that a few proven instances of actual confusion betoken a more substantial likelihood of confusion." *Lon Tai Shing Co., Ltd. v. Koch + Lowy*, 1991 WL 170734, 19 U.S.P.Q.2d 1081, 1089 (S.D.N.Y. 1991). Confusion, whether actual or likely, can take various forms. First, a consumer may buy one product mistakenly thinking it is a different product. *Playboy*, 486 F.Supp. at 428. Second, a consumer may be "confus[ed] as to source," and think that a plaintiff company's product is associated with a defendant company. *Id.* Third, a defendant may "gain a foothold in plaintiff's market by exploiting subliminal or conscious association with plaintiff's well-known name." *Id.* It is not necessary for a plaintiff to present "evidence of mistaken completed transactions." *Morningside Group*, 182 F.3d at 141. Confusion as to "affiliation, connection, or association[,] . . . damage to good-will, or loss of control over reputation," are actionable forms of trademark infringement. *Id.; Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir.1979). 24 Hour offered incidents of actual confusion as well as survey evidence concluding that there is a likelihood of confusion of association.

### (1) Incidents of Actual Confusion

24 Hour presented evidence that 24/7's employees recall that a number of people have come into 24/7 and asked whether there was an affiliation between 24 Hour and 24/7, including some who asked if they could use their 24 Hour Fitness membership cards at one of 24/7's facilities. JX F at 56–57 (deposition of Adolphus Holden); JX G at 71–74 (deposition of Barbara Holden); JX D at 47–52 (deposition of Tesean Green); JX A at 39–43 (deposition of Jesse Alvarado); JX J at 219–20 (deposition of Wahday Washington). One employee noted that two of those inquiries resulted in those individuals paying a fee to work out at 24/7. JX G at 71–72. It appears the majority of these people were from other parts of the country where 24 Hour has facilities. JX G at 71–74; JX D at 47–52; JX J at 219–20.

While evidence of actual mistaken transactions is not necessary, the kind of consumer confusion which the law protects against is "that which affects the purchasing and selling of the goods or services in question." *Lang*, 949 F.2d at 583 (internal quotations omitted). "There is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions." *Trs. of Columbia Univ.*, 964 F.Supp. at 747. Specifically, "[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 124 (2d Cir.2001) (emphasis in original); *see Deere & Co. v. MTD Holdings Inc.*, 2004 WL 324890, at *14 (S.D.N.Y. Feb. 19, 2004). Accordingly, a consumer's assumption that two companies are the same or associated is more powerful evidence of confusion than a mere inquiry about association. *See, e.g., M. Fabrikant & Sons, Ltd. v. Fabrikant Fine Diamonds, Inc.*, 17 F.Supp.2d 249, 253–54 (S.D.N.Y. 1998).

Incidents of actual confusion are often weighed against sales volume. *See, e.g., C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985) (two incidents found insignificant in light of sales volume); *Windsor, Inc. v. Intravco Travel Centers, Inc.* 799 F.Supp. 1513, 1524–25 (S.D.N.Y.1992) (one incident found

insignificant in light of sales volume). Where, however, the incidents clearly demonstrate an assumption that the defendant's product belongs to the plaintiff's company, even a single incident has been determined to favor the plaintiff. *See Bear U.S.A.*, 71 F.Supp.2d at 252 (one incident of customer attempting to return defendant's product to plaintiff's store characterized as "minimal" but favoring plaintiff); *see also Cache, Inc. v. M.Z. Berger & Co.*, 2001 WL 38283, at \*10 (S.D.N.Y. Jan. 16, 2001).

The fact that some individuals paid a one-time fee to work out at 24/7 after being told it was *not* affiliated with 24 Hour does not demonstrate confusion. There was no evidence that confusion led anyone to buy a membership at 24/7, thinking it was connected to 24 Hour. The evidence did show that a few people either sought to clarify whether there is an affiliation between the two companies, or initially assumed that affiliation. Assuming the latter, these incidents weigh in plaintiff's favor. However, given the sales volume of both companies, the number of incidents reported here are not particularly significant.

### (2) Survey Evidence

■ 24 Hour attempted to bolster the evidence of actual confusion with a consumer survey. Expert Philip Johnson conducted a "Squirt" survey [1] involving four hundred adult consumers between eighteen and fifty years of age. Tr. at 259–69. *See* PX 373 ("Johnson Survey") at 3. Respondents were selected to participate if they had joined a health club in the past six months or intended to do so in the next six months. *Id.* at 260; Johnson Survey at 3. The interviews took place in eight shopping mall-based research facilities within a twenty-mile radius of New York City. Tr. at 260; Johnson Survey at 3. A control group was shown a television commercial from Lifetime Fitness, while a test group was shown a 24 Hour Fitness television commercial. Tr. at 262–64; Johnson Survey at 4. Each respondent was then shown three health club print advertisements, one at a time, in rotated order, and asked whether they thought the health club in the print ad was the same as the one advertised in the television commercial. Johnson Survey at 5. The print ads were from 24/7 Fitness, Omni Health and Fitness, and New York Health and Racquet Club. *Id.* The statistical error for the survey was in the range of plus or minus 5.5%. *Id.* at 6.

The results of the survey showed that 56% of the respondents reported a belief that 24/7 was the same as 24 Hour Fitness, with 28% of those respondents indicating that the name contributed to their reason for this belief. *Id.* at 8. In comparison, 33 reported a belief that 24/7 was the same as Lifetime Fitness, with 5% of those giving a response indicating that the name contributed to this belief. *Id.* An additional 8% reported a belief that there is a relationship or sponsorship between 24/7 and 24 Hour, with 4% of those giving an indication that their basis for that belief was the name, and 9% reported they believed there was a relationship or sponsorship between 24/7 and Lifetime Fitness, with 2% of those indicating that the basis for their

1. In a "Squirt" survey, also called a Monadic sequential survey according to Johnson, the respondent is shown material from both products at issue, one after the other. Tr. at 297. In another form of survey, an "Ever Ready" survey, the respondent is shown only the junior mark and asked "if they have a belief about the source, and what that belief is." *Id.* at 298. Johnson said that his survey "bears some resemblance to both" forms, but was "certainly designed ... to show both parties, [as in a Squirt survey,] rather than the Ever Ready design, which only shows one." *Id.* at 297.

belief was the name. *Id.* at 9. These results are summarized in the table below:

|  | Respondents reporting a belief that the two gyms are the same | Respondents reporting a belief that the two gyms have a relationship or sponsorship |
|---|---|---|
| 24 Hour Fitness vs. 24/7 Fitness | 56% with 28% of those reporting *the name* contributed to this belief | 8% with 4% reporting *the name* contributed to this belief |
| Lifetime Fitness vs. 24/7 Fitness | 33% with 5% of those reporting *the name* contributed to this belief | 9% with 2% reporting *the name* contributed to this belief |

Johnson concluded that these results demonstrate an "adjusted" likelihood of confusion rate of 23–26%, depending on the mode of adjustment. *Id.* at 11–12.

24/7 obtained expert Eli Seggev to criticize the Johnson Survey. *See* DX I ("Seggev Report"). Seggev raised a number of problems with the survey that, he testified, made it "worthless." Tr. at 392. First, Seggev criticized Johnson for choosing Lifetime Fitness as the control group, such that the survey compared "apples to oranges" instead of "apples to apples." Seggev Report at 2. He said that the control should have been another fitness facility that advertised that it was open twenty-four hours a day. *Id.* 24 Hour argues the control was proper because it is a traditional survey method to use a control that shares characteristics with the stimuli to be compared, except for the characteristic at issue, in this case, the words "24 hour." Plaintiff's Post–Trial Brief ("24 Hour Brief") at 12–13. However, the Court finds Seggev's criticism compelling, especially in light of the fact that a number of 24 Hour's enforcement actions have ended in agreements as to acceptable uses of the following words, some as trademarks and others as descriptors: "open 24 hours," "24 hour," "24 hour a day," "Fit 24 Club," "Workout 24/7," "24/7 Tanning and Fitness," and "The 24 Hour Gym." *See* PX

540, 541. As conducted, the survey does not measure the amount of confusion between "24 Hour Fitness" and names such as these, or a name such as "All Day Gym," for that matter, compared to the amount of confusion claimed with "24/7 Fitness."

Seggev also criticized the evaluation of the survey results. Seggev Report at 3. Johnson characterized the results as demonstrating that 28% of the respondents reported that their belief that 24/7 and 24 Hour were the same or related was "because of the name." According to Seggev, this characterization was misleading because some of those respondents actually stated "because of the name" or a similar statement, while others said "open 24 hours," "24/7," or "It is 24/7 Fitness." Seggev said that these latter responses should not have been lumped together with those who specifically said something about "the name." *Id.* at 4. Such responses could indicate that the basis for the confusion was an impression that the businesses were both open 24 hours a day, not just the name. He pointed out that the percentage of respondents that clearly stated that "the name" was the basis for their belief were as follows: 4% said "same name," 1% said "because of the name," 1% said "names are similar," and 3% said "same gym/Fitness Club." *Id.* at 3. If only those categories are counted, confusion that is clearly "because of the name" drops to 9%. If "same gym/Fitness Club" is omitted, because it also does not specifically state that the name is the basis for the confusion, the percentage is even lower. While Johnson's study used a "double blind" approach, that is, neither the interviewers or the respondents were aware of the purpose of the research or the identity of the party commissioning the survey, Johnson Survey at 7, the coding was not similarly "blind": Johnson knew the purpose of the research and was employed by

24 Hour. Therefore, his biases could be reflected in the coding of the responses. *See* Tr. at 413–15.

A survey Johnson performed in another case was also criticized for "lumping" respondents' statements. *See Coors Brewing Co. v. Anheuser–Busch Co., Inc.,* 802 F.Supp. 965, 973 (S.D.N.Y.1992). In *Coors Brewing Co.,* the plaintiff claimed that the defendant's commercial comparing their beer, Natural Light, to Coors Light, included implied falsehoods about their brewing and shipping processes. *Id.* at 967. The plaintiff hired Johnson to evaluate the impact of the advertisements. *Id.* at 970. The court found that the open-ended questions the survey asked were "generally reliable," but that some of the results were uninformative because Johnson had "lumped together the percentage of respondents who said that Coors Light is *diluted* and the percentage of respondents who said that Coors Light is *watered down." Id.* at 973 (emphasis added). The court found that "it is literally true that in one sense Coors Light is 'diluted,' [in that, after shipping, local water is added to Coors' high gravity brew which has an alcohol content over the statutory maximum], [but] Coors Light does not appear to be 'watered down,' in the sense of containing more water than beer should or than Natural Light does." *Id.* Ultimately, the court said that "because [there was] no way of knowing what percentage of respondents said that Coors Light is diluted and what percentage said that Coors Light is watered down, this category of responses has no probative value." *Id.*

Here, although Johnson lumped together certain responses to reach his final percentages, he did provide a breakdown, which allows the Court to make its own conclusion about the probative value of the various responses. The Court finds that Johnson's survey has little probative value

as it does no more than verify the possibility of a low level of confusion. As Seggev pointed out, the survey did not measure whether another gym advertising that they were open 24 hours a day would generate a similar level of confusion. Tr. at 393–94. At the same time, the survey does not adequately distinguish between respondents confused because of the name, and those confused because the two facilities appear to offer a similar service, that is, 24–hour access. Furthermore, the questions asked were somewhat leading. By asking "Do you believe that the health and fitness club in this ad is OR is not the same as the one that was advertised in the television commercial," Johnson Survey at 5, the interview suggests that the respondents attempt to find a connection. Of course, researchers are often in a bind: on the one hand, criticized for leading questions, on the other, criticized for questions that are so general as to be unhelpful. *See Warner Bros. Inc. v. Am. Broad. Co., Inc.,* 720 F.2d 231, 244 (2d Cir.1983). In the end, however, this survey did not control for the power of suggestion.

24/7 has raised a number of other criticisms of the Johnson Survey, which the Court finds also erode its probative value. Because only one of the testing sites used in the survey was in Manhattan, 37.5% of the respondents were not from New York City, but were instead from New Jersey and Long Island. Defendant's Post–Trial Brief at 14; *see* Brief in Support of Defendants' Motion In Limine to Exclude the Testimony and Survey Report of Philip Johnson at 6–7 and Exh. A. Only 7.06% of 24/7's members are from New Jersey and Long Island. *Id.* While the use of a twenty-mile radius may be standard in surveys such as this, a smaller range would appear to be more appropriate in this case, given the nature of the services at issue and the location. While many people commute from New Jersey and Long Island to work

in Manhattan, and some perhaps join a gym near their workplace instead of their home, those most likely to be prospective consumers live in Manhattan, and the fact that the survey included a significant number of respondents who do not, makes the survey's assessment of the likelihood of confusion among 24/7's consumer base less convincing.

In addition, because the survey included respondents who had recently joined a gym, they were not technically prospective purchasers of a gym membership. This might be appropriate for some products or services since "past users are good proxies for future purchasers." *Cumberland Packing Corp. v. Monsanto Co.,* 32 F.Supp.2d 561, 572 (E.D.N.Y.1999); *see, e.g., Coors Brewing Co.,* 802 F.Supp. at 970 (survey included respondents who had consumed beer in the preceding four weeks). However, since gym memberships usually last one or two years, that choice seems problematic here. Even in *Cumberland,* which involved surveys testing confusion between purchasers of sugar substitutes, a product a consumer might buy on a daily or weekly basis, such logic was not convincing. *See id.; accord Universal City Studios, Inc. v. Nintendo Co.,* 746 F.2d 112, 118 (2d Cir.1984) ("[T]he survey utilized an improper universe in that it was conducted among individuals who had already purchased or leased Donkey Kong machines rather than those who were contemplating a purchase or lease."); *Am. Footwear Corp. v. Gen. Footwear Co.,* 609 F.2d 655, 660 n. 4 (2d Cir.1979) (past purchasers of hiking boots were not proper participants in survey). Considering both the evidence of actual confusion and the survey evidence, the Court finds this factor, at best, inconclusive as to whether consumers are likely to be confused.

## f. Intent to Confuse

■ If a defendant "adopted its mark with the intention of capitalizing on plain-tiff's reputation and good will and any confusion between his and the senior user's product," the court may find bad faith, and therefore, a likelihood of confusion. *Lang,* 949 F.2d at 583 (*quoting Edison Bros. Stores, Inc. v. Cosmair, Inc.,* 651 F.Supp. 1547, 1560 (S.D.N.Y.1987)). Prior knowledge of another's trademark and continued use after notice from the plaintiff may support a finding of bad faith. *Mobil Oil Corp.,* 818 F.2d at 258; *Stern's Miracle–Gro Prod., Inc. v. Shark Prod., Inc.,* 823 F.Supp. 1077, 1088 (S.D.N.Y. 1993). If a plaintiff's mark is long-standing and the marks are very similar, a defendant must provide "a reasonable explanation of its choice [in order] to establish lack of intent to deceive." *Stern's Miracle–Gro,* 823 F.Supp. at 1087. Factors that support a finding of good faith include "[s]election of a mark that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel." *Lang,* 949 F.2d at 583.

First, 24/7's mark clearly reflects a characteristic of the company's services. Furthermore, Washington provided a credible explanation about how he chose the name in mid–2001, and why he decided to use 24/7. Washington first acquired a gym originally called Johnny Lats, and was required, by agreement with the previous owner, to change the name within five years. Tr. at 355. The "tag line" of the existing gym included "open 24 hours seven days a week." *Id.* at 356. Washington wanted to incorporate "fitness" into the new name and originally thought about adding "24/7 365." *Id.* He eventually decided to shorten it to 24/7 because "it looked good." *Id.* at 357. While "doubts about intent are resolved against the newcomer, ... a reasonable explanation of its choice is essential to establish lack of intent to deceive, specially [sic] where the

prior mark is a coined or fanciful one." *E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F.Supp. 502, 514–15 (E.D.N.Y.1975) (comparing plaintiff's mark, TEFLON, to defendant's, EFLON). Because Washington's explanation was credible and reasonable and the 24 Hour mark is at best suggestive, not "coined or fanciful," the Court finds 24/7 has met the burden of providing the required explanation.

While 24/7 is charged with constructive knowledge of 24 Hour's trademark under 15 U.S.C. § 1072, the evidence showed that the individuals responsible for choosing the 24/7 mark did not have actual knowledge of 24 Hour's trademark when selecting the 24/7 name. Washington subscribes to the Club Business Industry magazine in which 24 Hour has been featured regularly, *see* Tr. at 101–02; PX 546, but this does not clearly demonstrate that he had previously noted the company's trademark use of "24 Hour." Washington testified that he first heard of 24 Hour when he saw their logo during a televised 2002 playoff game between the Yankees and the Angels. Tr. at 358, 364–65.[2] 24 Hour also points out that Barbara and Adolphus Holden, two of 24/7's employees, stated that they had previous knowledge about 24 Hour Fitness. JX F at 42; JX G at 11–12, 30. Barbara Holden agreed she had known about 24 Hour "for awhile," JX G at 11–12, 30, and Adolphus Holden said he knew about the company since it changed from "Family Fitness" to "24 Hour Fitness," JX F at 42, which could have been around 1995. *See* Tr. at 32. However, there was no evidence these employees had any input in creating the name for 24/7.

24/7 did not do a trademark search before adopting the name. After receiving a cease and desist letter from 24 Hour, the company decided to undertake a search and its attorney, Earl Wilson, also a former partner in the 24/7 clubs, found the results inconclusive. JX L at 27–28 ("maybe you could get this name and maybe you can't, we're just not sure"). Washington and Williams told Wilson that his search was sufficient. *Id.* at 32, 52. While this trademark search may have been incomplete,

> [the Second Circuit] has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith even in the total absence of a trademark search, much less on the basis of an allegedly flawed trademark search.... Furthermore, in some cases even where a trademark search resulted in knowledge of the earlier mark, in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, th[e] Court has found the junior user to be in good faith.

*Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir.2005) (citations omitted). Because the legal advice 24/7 received upon conducting a trademark search was inconclusive, the company's decision to continue to use the name, even in the face of possible litigation, is not evidence of bad faith.

24 Hour attempts to use other aspects of 24/7's conduct in this litigation as evidence of bad faith, including the fact that 24/7 persisted in using the name while litigating this case. 24 Hour Brief at 15–16. Courts have found such persistence to contribute to a finding of bad faith. *See, e.g., The Am. Auto. Ass'n v. AAA Auto.*

---

**2.** Washington originally characterized the game as a "World Series" game, *see* Tr. at 358, 364–65, but of course, the Yankees and Angels are both American League teams and would not meet in the World Series. The Anaheim Angels defeated the New York Yankees in the 2002 American League Division Series.

*Club of Queens, Inc.*, 1999 WL 97918, at *7 (E.D.N.Y. Feb. 8, 1999); *Tri–Star Pictures*, 14 F.Supp.2d at 357–58. However, these cases are distinguishable because many other factors contributed to the bad faith finding. For example, in *Am. Auto*, the court found that the defendant was aware of the plaintiff's mark before adopting his own, that his mark was not descriptive of his services, that he advertised identical services as the plaintiff although he did not actually offer all of those services, and that he had not offered a credible explanation of his development of the mark. 1999 WL 97918, at *7. Similarly, in *Tri–Star Pictures*, the court found that the defendant had actual knowledge of the plaintiff's title when he adopted his, referred to plaintiff's film in a brochure advertising his own, marketed the film in Japan with plaintiff's name and a "II" to imply it was a sequel, was evasive and incredible in testifying at trial, and failed to offer a credible innocent explanation for his choice of title. 14 F.Supp.2d at 357–58. The facts here are simply inapposite.

The Court *is* required to consider a defendant's conduct after being notified of an infringement claim. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir.1996) (remanding on the issue of bad faith and finding that the district court gave no consideration to defendant's conduct after litigation was initiated). In *Int'l Star Class*, the defendant had copied the name of the plaintiff's yacht racing association word-for-word, as well as its solid red five-pointed star logo, and applied it to a line of "classic nautical sportswear" with "authentic details taken from the sport of competitive sailing" and "elements and

patterns taken directly from actual racing sails." *Id.* at 751. In noting that the district court should have considered the defendant's persistence in using the mark in the face of litigation as evidence of bad faith, the court stated, "Hilfiger was betting on the fact that ISCYRA would not prevail in its suit. Hilfiger lost that bet, and should not escape the consequences of its conduct." *Id.* at 754.

On its face, 24/7's conduct seems similar in that the company has conducted itself as if it will prevail here. When given notice of 24 Hour's claim, Williams briefly explored plaintiff's claim by conducting an initial trademark search, which revealed inconclusive results. 24/7 continued to advertise its gyms, and initiated a website. Williams then offered to settle for half the cost of litigation, which 24 Hour characterizes as extortion. 24 Hour Brief at 16. With no prospect of settlement on his terms, Williams dug in his heels and trial ensued. 24/7 presents a number of statements from Williams and his employees which show his intent to fight. At his deposition, Williams said "[W]e offered to change our name to 24/7 Gym,[3] and you people turned it down, my impression was that you were pigs, inconsiderate and deserved for me to put a fight up because it was inappropriate and bullying." JX K at 299–300. One of his employees said Williams did not really care about the name but that "He wants to get paid for it." JX F at 81. Williams admitted that physically changing the name would be easy. Tr. at 212, 215. Williams also testified that his belief in his position was strengthened when 24 Hour's motion for a preliminary injunction was denied. *Id.* at 228.

**3.** If Williams's statement is true, and 24 Hour turned down an offer to use the name "24/7 Gym," this could raise some questions concerning 24 Hour's behavior. 24 Hour had agreed to let a prior alleged infringer use, descriptively, "The 24 Hour Gym," which appears to be closer to its mark. PX 540.

In any case, Williams's conduct is not as egregious as in *Int'l Star Class,* and arises in a somewhat different factual context. The infringement in that case was clearly deliberate. Even if Hilfiger assumed its use of the words from the mark of a sailing company was legal, the fact that the defendant had adopted the plaintiff's logo was virtually admitted because the company advertised its line of clothing as containing details from competitive sailing. *See Int'l Star Class,* 80 F.3d at 752 (district court issued permanent injunction enjoining Hilfiger's use). Hilfiger's trademark search was only for marks within a clothing classification and did not specify that the company planned to use the mark on nautical clothing with details from competitive sailing. *Id.* at 753. Furthermore, Hilfiger went against the advice of its counsel, who told the company to do a wider search before proceeding. *Id.* Finally, the court found that Hilfiger had failed to give a "credible innocent explanation" for the use of the Star Class mark. *Id.* (citations omitted).

Here, in contrast, the Court has found that 24/7 has offered a credible and reasonable explanation for its use of the term 24/7. In addition, 24/7 did not go against the advice of counsel in deciding to persist in testing its rights and go to trial in this case. Williams's statements lambasting 24 Hour for filing suit against him, while perhaps in poor taste, do not support a finding that 24/7 adopted its name with intent to trade on 24 Hour's reputation. Instead, they are consistent with his belief that his use of 24/7 does not infringe and that, if 24 Hour wants to preclude him from using the term, he should be compensated.

The Court sees Williams's offer to settle for half the cost of litigation, which amounted to a demand of between $250,000 and $750,000, JX K at 300; Tr. at 224–26, in the same light. A reasonable belief that one is acting within one's rights may mitigate against a finding of bad faith. *See New York State Soc. of Certified Pub. Accountants v. Eric Louis Assoc., Inc.,* 79 F.Supp.2d 331, 349–50 (S.D.N.Y.1999) (*citing E. & J. Gallo Winery v. Consorzio del Gallo Nero,* 782 F.Supp. 472, 475 (N.D.Cal. 1992)). On the other hand, failing to consult trademark counsel and persisting in pressuring a plaintiff to purchase a mark or name can show not only that one's belief is not reasonable, but also bad faith. *Id.* Williams did seek counsel's advice by doing a trademark search, which was inconclusive. He could have pursued further advice, but subsequently obtained counsel to litigate this case on his behalf. He framed his offer to settle in reference to the costs of litigation, not an unreasonable basis upon which to start if one believes in one's legal position.[4] Cases in which exorbitant demands contribute to a finding of bad faith involve stronger additional evidence of intent to confuse. *See, e.g., TCPIP Holding Co., Inc. v. Haar Comm., Inc.,* 244 F.3d 88, 103 (2d Cir.2001) (company registered 66 domain names after receiving cease and desist letter and and then offered to sell 16 or more names in a package of around a half million dollars in exchange for plaintiff's domain name); *Toys R Us Inc. v. Abir,* 45 U.S.P.Q.2d 1944, 1948 (S.D.N.Y.1997) (defendants admitted to intending to confuse).

Finally, 24 Hour points to 24/7's website which at one point contained links to pornography, as another indication of bad faith. *See Ford Motor Co. v. Lapertosa,* 126 F.Supp.2d 463, 466 (E.D.Mich.2000) ("Courts uniformly have held ... that the use of a famous trademark in a domain name used to purvey pornography consti-

---

4. The Court has no evidence to assess the accuracy of Williams's estimate of plaintiff's costs, and, of course, makes no finding on that question.

tutes dilution."). 24/7 contracted with a third party to construct the website. Both Williams and Washington testified credibly that as soon as they realized the site had links to pornography, they told the creator to take the website down. Williams failed to follow up on this direction, and the site was not removed. When it was again brought to his attention, however, he ensured that it was disabled. Tr. at 234. The website, while perhaps demonstrating a lack of due diligence in relation to 24/7's own business matters, does not show bad faith in this context. Considering all the evidence, the Court finds that this factor weighs against 24 Hour in that there is insufficient evidence for a finding that 24/7 demonstrated an intent to capitalize on the strength of 24 Hour's mark in naming their fitness club 24/7 Fitness.

### g. Quality of the Products

This factor of the *Polaroid* test involves an analysis of the quality of the companies' products. If the defendant's product is inferior, the plaintiff's reputation could be affected by any association consumers might make. *See Fed. Ex.*, 1998 WL 690903, at *18. On the other hand, similarity in quality between the products could also increase the likelihood that consumers would associate the defendant's product with the plaintiff's company. *See Lois Sportswear*, 799 F.2d at 875. In reference to the factors measuring the similarity of the marks and the competitive proximity of the parties' services, 24 Hour argued that the companies' marks were "highly similar" and that the companies offer an "identical" product. 24 Hour Brief at 7. In contrast, when discussing this factor, 24 Hour asserts that "a cursory comparison of photographs of Defendants' and Plaintiffs' facilities and signage shows the disparity between the facilities." *Id.* at 18. Any difference in quality here is

not distinct enough to change the remaining portions of the Court's analysis.

### h. Sophistication of the Buyers

"[The] analysis of consumer sophistication 'consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'" *Star Indus.*, 412 F.3d at 390 (*quoting Sports Auth.*, 89 F.3d at 965). The level of sophistication, or lack thereof, can be proven either by direct evidence, such as with a survey or expert opinion, *id.*, or the Court may rely on "indirect indications of sophistication" established by the "nature of the product or its price." *Id.* Despite the testimony of CEO Mastrov, who said that "a vast majority [of 24 Hour members] are fairly sophisticated," Tr. at 36, 24 Hour attempted to show that its consumer base is not particularly sophisticated: "the average consumer of fitness services is not a professionally trained buyer, but rather a retail purchaser of a moderately priced product." 24 Hour Brief at 18–19. 24 Hour sought to substantiate this at trial by submitting evidence of the prices of their membership fees, and pointing out that many of their members are "unfamiliar with fitness" and some do not speak English. Tr. at 35, 72–73, 110–11. While most fitness club members may not be experts in health club brands, a gym membership is a fairly significant monetary commitment, requiring a relatively mindful, and therefore sophisticated, purchasing decision. Furthermore, there is no evidence of any particular difference in the level of sophistication of the two parties' consumer bases. Therefore, the sophistication factor is neutral in this analysis.

### i. Balancing of the Factors

After analyzing each of the Polaroid factors separately, "[t]he court should

weigh each … in light of the totality of its findings." *Fed. Ex.*, 1998 WL 690903, at *18. To summarize the Court's findings thus far, the two parties' marks communicate the same message and appear very similar. 24 Hour's mark is strong in the areas in which it is located and because it has received national attention, but the mark cannot escape its inherent descriptiveness in a market in which it is not physically present and has not specifically advertised or promoted. The companies are not directly competitive because of their geographic separation, which is not overcome by any evidence that 24 Hour and 24/7 share an appreciable overlapping consumer base. 24 Hour clearly wants to "bridge the gap" and has provided sufficient evidence of attempts to do so, but any co-branded facilities it opens here would be particularly distinct. Most of these conclusions are affected by the parties' geographic locations, and consequently, the essential question is whether 24 Hour's extensive marketing efforts overcome the geographic separation.

An older Second Circuit case sheds light on the kind of situation required to trump geographic separation. In *Lincoln Rest. Corp. v. Wolfie's Rest.*, 291 F.2d 302 (2d Cir.1961), the court found a likelihood of confusion between a well-known restaurant in Miami Beach called Wolfie's, and defendant's newly-established restaurant in Brooklyn of the same name. The court pointed to evidence that fifty-to-sixty percent of the patronage at the Miami Beach restaurant during the tourist season was from Brooklyn, that New York celebrities had mentioned the restaurant as a hallmark of Miami Beach social life, and that the Brooklyn restaurant had used menus of a similar color and format as the one in Miami Beach, including menu items labeled "Floridian Style." *Id.* at 302–03. Evidence of strength of the mark in New York City, strong similarity between the

marks, a demonstrated shared consumer base, and clear indications of bad faith overcame the geographic separation which could otherwise limit trademark protection to the plaintiff's area.

The requirement of strong evidence in support of other factors to overcome geography also played out in the Second Circuit's analysis in *Brennan's*. While emphasizing geography, the court referred to various other factors in the *Polaroid* analysis, finding that "in the absence of actual confusion or bad faith, substantial geographic separation remains a significant indicator that the likelihood of confusion is slight." *Brennan's*, 360 F.3d at 134. Similarly, in this case, the factors of actual confusion and bad faith do not support 24 Hour, making likelihood of confusion less likely given the geographic separation between the companies. However, the analysis is more complex here because of 24 Hour's established intent to enter the New York market, which was absent in *Brennan's*. There, the Second Circuit acknowledged this distinction by relying on a case in which the court had found a lack of intent to enter the defendant's market dispositive where the parties' markets were geographically distinct. *Id.* at 135 (*citing Dawn Donut Co. v. Hart's Food Stores*, 267 F.2d 358, 364 (2d Cir.1959)). In *Dawn*, a Michigan-based plaintiff sought to enjoin the defendant from using the word "Dawn" in the retail sale of doughnuts and baked goods near Rochester, New York. 267 F.2d at 360. The plaintiff had no retail stores in the Rochester area, but made licenses available for others to use the mark for retail sales. *Id.* While many baking companies used their baking mixes, few had obtained licenses to use the mark for retail sales. *Id.* at 361. The court found the defendant did not have actual knowledge of the plaintiff's mark when it chose to use the same word on its baked

goods and had a plausible explanation for doing so, although it had failed to do a trademark search beforehand. *Id.* at 362. The trend of the plaintiff's business showed a decrease in licenses in New York state and throughout the country. *Id.* at 365. Ultimately, the court found no likelihood of confusion because the parties used separate markets and there was no likelihood that the plaintiff would enter the defendant's market. *Id.* at 364–65. However, the court also stated that if the plaintiff were to expand into defendant's market, an injunction could ensue. *Id.* at 365 ("the plaintiff may later, upon a proper showing of an intent to use the mark at the retail level in defendant's market area, be entitled to enjoin defendant's use of the mark").

In comparison, here the Court has concluded that while there are no immediate concrete plans, 24 Hour is quite likely to enter the New York market relatively soon given that the company has sought to do so for a number of years and is rapidly expanding nationwide. However, as the evidence stands now, considering the other *Polaroid* factors as well as the geographic separation, the Court finds an insufficient level of likelihood of confusion to warrant relief on 24 Hour's claims. Were 24 Hour to aggressively promote itself in New York, or otherwise provide sufficient evidence that its mark is well-known by New York consumers, establish that it has an appreciable number of traveling members seeking fitness facilities in New York, and take clear steps towards opening one of its "EXPRESS" facilities here, which are a similar size as 24/7's, SF ¶ 16, as opposed to a co-branded facility, the Court would be faced with a different question.

**B. Other Claims**

■ 24 Hour raises common law trademark infringement and unfair compe-

tition claims and a state law claim for making false and misleading statements. These claims depend on the same analysis outlined above. *See W.W.W. Pharm.,* 984 F.2d at 576 (state law claim of unfair competition shares common elements with Lanham Act claim of trademark infringement, essentially, actual confusion and likelihood of confusion); *Avon Prod., Inc. v. S.C. Johnson & Son, Inc.,* 984 F.Supp. 768, 800 (S.D.N.Y.1997) ("The standards for bringing a claim under § 43(a) of the Lanham Act are substantially the same as those applied to claims brought under the New York common law for unfair competition and §§ 349 and 350 of the New York General Business Law."). Therefore, 24 Hour is not entitled to relief on these claims.

■ 24 Hour also claims dilution under the Lanham Act and under state law. These claims involve a showing of distinctiveness of mark, similar to the strength analysis above. *See Savin,* 391 F.3d at 451. The claims also require a showing of dilution, either by blurring or tarnishment. "[B]lurring has typically involved the whittling away of an established trademark's selling power through its unauthorized use by others upon dissimilar products . . . [while] [t]arnishment generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *Deere & Co. v. MTD Prod., Inc.,* 41 F.3d 39, 43 (2d Cir. 1994) (internal quotations and citations omitted). 24 Hour contends that the incidents of actual confusion demonstrate blurring and that the pornography links on 24/7's now-defunct website constitute tarnishment. 24 Hour Brief at 20. The Court finds neither of these facts more convincing in the dilution context than they were in the infringement context.

Therefore, 24 Hour is not entitled to relief on these claims.

Finally, 24 Hour raises a claim of cybersquatting which requires a showing that 1) defendants registered, trafficked in, or used a domain name that is identical or confusingly similar to or dilutes a distinctive or famous mark and 2) defendants acted with bad faith intent to profit from that mark in a domain name. 15 U.S.C. § 1125(d). While 24/7 did establish its website after obtaining notice of 24 Hour's claims, the Court has already determined that there is no evidence of a bad faith intent to profit. Furthermore, 24/7's website added "club" to the name, making it less similar to 24 Hour's. 24 Hour's mark does merit more distinctiveness in this context than in the infringement context because a website taps into a national consumer base rather than a local one. However, given that 24/7 has taken down its website, and the lack of evidence of bad faith, the Court finds that 24 Hour is not entitled to relief on its claim for cybersquatting.

## IV. CONCLUSION

To conclude, the Court finds insufficient likelihood of confusion to warrant relief on 24 Hour's claims. Judgment is therefore entered in favor of 24/7.